Eph H. Hoover, Jr., and Lucinda Hoover, et al. [1] v. Commissioner. Hoover v. Commissioner
Docket Nos. 2312-62, 2313-62, 2322-63, 6192-66.
United States Tax Court
T.C. Memo 1968-49; 1968 Tax Ct. Memo LEXIS 247; 27 T.C.M. (CCH) 226; T.C.M. (RIA) 68049; March 27, 1968. Filed *247 Judson Harwood, 515 Nashville Bank & Trust Bldg., Nashville, Tenn., for the petitioners. Jack D. Yarbrough and Vallie C. Brooks, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes and additions to tax for the years and in the amounts as follows: Docket No.
Tax year
Deficiency
Additions to tax under Sec. 6653(b) [2]
2312-62
1958
$158,658.98
$ 79,329.49
2313-62
1957
49,655.55
24,827.78
2322-63
1959
76,870.60
38,435.30
6192-66
1956
12,364.73
6,182.37 227 By amendments to answers filed at the trial, respondent claimed increased deficiencies and additions to tax in the following amounts: Amount of increase
Deficiency as
Addition to tax, Docket No.
Tax year in deficiency
increased
as increased
2312-62
1958
$11,352.75
$168,762.93
$84,381.47
2313-62
1957
4,500.00
52,655.55
25,327.78
2322-63
1959
1,961.42
78,178.21
39,089.11
A number of issues raised by the pleadings have been disposed of by agreement of the parties leaving for our decision the following: (1) Whether assessment and collection of any deficiency for the year 1956 are barred by the *248 statute of limitations. This requires a determination of whether petitioners Eph H. Hoover, Jr., and Johnnie B. Shannon (former wife of Eph H. Hoover, Jr.), for the year 1956, filed a false and fraudulent income tax return with intent to evade tax. (2) Whether petitioner Eph H. Hoover, Jr., received income in each of the years 1957, 1958, and 1959 from amounts paid by Hoover Motor Express Company, Inc., and Auto Equipment & Supply, Inc., with moneys received from Hoover Motor Express Company, Inc., for the purpose of buying, maintaining, and operating race cars. (3) Whether petitioners Eph H. Hoover, Jr., and Lucinda Hoover realized income in the year 1958 from the conveyance by Hoover Motor Express Company, Inc., of a freight terminal property to the former wife of Eph H. Hoover, Jr., for an amount less than the fair market value of the property, and, if so, the amount of income so realized. (4) Whether petitioners Eph H. Hoover, Jr., and Lucinda Hoover received income from the payment by Hoover Motor Express Company, Inc., of salary and expenses of Fred Capshew in the years 1958 and 1959 because of services rendered and payments made by Fred Capshew for the benefit of petitioner *249 Eph H. Hoover, Jr., and if so the amount of such income. (5) Whether amounts paid by Hoover Motor Express Company, Inc., to Eph H. Hoover, Jr., during the years 1956 through 1959, designated as reimbursements of expenses were in fact income to petitioners. (6) Whether all or any part of amounts paid by Hoover Motor Express Company, Inc., during the years 1956 through 1959 on invoices which it designated as "S-shop expenses" were payments made for the benefit of petitioner Eph H. Hoover, Jr., and for that reason constituted income to petitioners. (7) Whether amounts received by petitioner Eph H. Hoover, Jr., from Hoover Motor Express Company, Inc., during the years 1956 through 1959, which were shown on the books of Hoover Motor Express Company, Inc., as liquor purchases for the use of its Sales Department and as reimbursements to its Chief Accounting Officer, were used to any extent for the benefit of Hoover Motor Express Company, Inc., in such a manner as not to constitute income to petitioners, and, if so, the amounts so used. (8) Whether any part of petitioners' underpayment of tax for each of the years 1956, 1957, 1958, and 1959 is due to fraud within the meaning of section 6653(b). *250 Findings of Fact Some of the facts have been stipulated and are found accordingly. Eph H. Hoover, Jr., and Johnnie B. Shannon (former wife of Eph H. Hoover, Jr.), the petitioners in Docket Nos. 2313-62 and 6192-66, were both residents of Davidson County, Tennessee at the date of the filing of each of the petitions. Eph H. Hoover, Jr., and Lucinda Hoover, petitioners in Docket Nos. 2312-62 and 2322-63, are husband and wife and were residents of Davidson County, Tennessee at the date of the filing of each of the petitions. Eph H. Hoover, Jr. (hereinafter referred to as petitioner), has been married three times. During the years 1956, 1957, and part of 1958 he was married to Johnnie Billingsley Hoover. There were three children born of this marriage. Petitioner and Johnnie were divorced in 1958, and petitioner then married Mary Lucinda Parris Harper. For the calendar year 1956 petitioner and Johnnie filed a joint Federal income tax return 228 on April 15, 1957, [3] with the district director of internal revenue at Nashville, Tennessee. For the calendar year 1957 they filed a joint Federal income tax return with the district director of internal revenue at Nashville, Tennessee. For the *251 calendar years 1958 and 1959 petitioner and Mary Lucinda filed joint Federal income tax returns with the district director of internal revenue at Nashville, Tennessee. Johnnie and Mary Lucinda are petitioners in these cases only by reason of having filed joint returns with petitioner Eph H. Hoover, Jr. Hoover Motor Express Company, Inc. (hereinafter referred to as HME), is a common carrier of freight in interstate commerce subject to the jurisdiction of the Interstate Commerce Commission (hereinafter referred to as ICC). HME was founded by petitioner's father. It was incorporated under the laws of the State of Tennessee on May 27, 1930. Petitioner was born on April 15, 1922, near Murfreesboro, Tennessee. He graduated from Central High School in Murfreesboro and during the years 1940 through 1942 attended Middle Tennessee State College. In 1942 petitioner became employed as the manager of the Murfreesboro terminal of HME and in 1950 became his father's *252 assistant at the main terminal in Nashville. On March 6, 1950, after his father's death, petitioner was elected president of HME. From that date throughout the years here in issue petitioner was president of HME. HME maintained its records and filed its Federal income tax returns on an accrual method of accounting. Its returns were filed with the district director of internal revenue at Nashville, Tennessee. HME filed annual reports as required by law with the ICC for the years ended December 31, 1956 through December 31, 1960. During the years 1956 through 1960, the capital stock of HME (par value $100 per share) was held by petitioner, his three sisters, his stepmother and an aunt, except that in 1959 HME purchased the shares owned by the aunt. The ownership of the outstanding capital stock during the years 1956 through 1960 was as follows: Name
Relationship to petitioner
Years and shares owned[4] *253 1956
1957
1958
1959
1960
Eph H. Hoover, Jr.
21
21
21
21
21
Miriam M. Cole
Sister
19
19
19
19
19
Eleanor E. Derryberry
Sister
19
19
19
19
19
Dorothy Milam
Sister
19
19
19
19
19
Ruth N. Garrett
Stepmother
19
19
19
19
19
Matalee Pond
Aunt
2
2
2
0
0
___
___
___
___
___
Total
99
99
99
97
97 None of the shareholders other than petitioner was an officer during any of the years here in issue. Ruth N. Garrett worked 2 or 3 days a week, on the average, in the office of the Murfreesboro, Tennessee, terminal of HME. None of the other shareholders was employed by HME or otherwise rendered services to HME except as a director. The directors of HME during the years here involved were: Eph H. Hoover, Jr
1956 through 1960
S. W. Barton
1956 through 1960
W. C. Hembree, Jr
1956 through 1960
Ruth N. Garrett
1956, 1959, 1960
Miriam M. Cole
1956, 1959, 1960
Eleanor E. Derryberry
1957, 1958
Dorothy Milam
1957, 1958 S. W. Barton was also a vice president of HME during these years and W. C. Hembree, Jr., was secretary-treasurer and chief accounting officer. In December 1959, all of the shareholders agreed to sell their stock to Ryder Systems, Inc. (hereinafter referred to as Ryder), subject to the approval of the ICC. They agreed also to sell terminal properties, which *254 were owned by them jointly and were rented to HME. The consideration agreed upon was $4,865,000 for all of the 229 stock and seven terminal properties owned by the shareholders jointly, plus $635,000 for one terminal owned by petitioner individually, plus liens of $30,500 and $38,000 on two of the terminals, plus cancellation of receivables due HME in connection with the properties, less adjustments equal to the price of one terminal which was not conveyed and the price of HME's acquisition of two shares of stock from Matalee Pond. On September 22, 1961, Ryder filed a suit for rescission of the contract. The complaint stated that Ryder had been informed in early 1961 that HME was operating at a loss and had agreed with the HME shareholders to assume temporary management of HME subject to approval by the ICC. Such approval was granted by the ICC on August 11, 1961, and Ryder assumed management of HME on September 5, 1961. The Complaint alleged in part: * * * Complainant is informed, believes and therefore alleges that a substantial part of said losses were not actual losses, but were the result of fraudulent milking and looting of the corporation at the instance and direction of *255 the defendant, E. H. Hoover, Jr., * * * that the accounting methods of have been such as to enable concealment * * *. VI Complainant alleges on information and belief that among the methods used to milk and loot were (a) the payment by of invoices for materials supplied to others; (b) the payment by of padded or fictitious expense accounts, and the payment of salaries for services not performed, including payments of salaries to the defendants other than E. H. Hoover, Jr., (c) the removal of tires and truck parts and supplies from shops, but not for use; (d) the payment to others of dividends on insurance owned by and (e) the routing of purchases and sales by through middlemen who received profits at the expense of. VII Complainant alleges that, as the result of the activities hereinbefore alleged, has been charged by the Internal Revenue Service with tax frauds, with accompanying newspaper publicity; * * * and that the value of the property has been impaired to an extent impossible to measure in dollars and cents. This litigation was disposed of by agreement of the parties. On March 11, 1964, the stock purchase agreement was amended and Ryder dropped its suit for rescission. The agreed *256 consideration was reduced to $3,950,000. All real property, except the Birmingham terminal, was to be free of liens. Accounts standing on the books of HME with reference to any of the sellers and corporations owned or controlled by petitioner were to be mutually cancelled. The sellers agreed to pay income tax deficiencies of HME for years prior to 1961. Except as modified by the agreement of March 11, 1964, the contract of sale dated December 1, 1959, and the management agreement were ratified. On March 31, 1965, the closing date, an agreement was executed between Ryder, the sellers, and a designate descrow agent placing $1,525,000 of the purchase price of $3,950,000 in escrow to insure the seller's agreement indemnifying Ryder against tax deficiencies. On January 29, 1964, an indictment was filed against petitioner in the Middle District of Tennessee charging him in five counts with causing the filing of false and fraudulent tax returns for HME for the taxable years 1957, 1958, and 1959. Petitioner pleaded guilty to three of such counts and was sentenced to 2 years imprisonment on each, the sentences to run concurrently. Petitioner was not criminally charged with fraud in connection *257 with his individual returns filed during the years here in issue. The other shareholders at no time took any action to recover from petitioner any loss sustained by them because of petitioner's diversion of corporate funds of HME. They were not aware until the suit was filed of many of the transactions alleged in the Ryder complaint to constitute "milking" HME, but they were aware of the salaries they received, of the income received through the family partnership, Truck Equipment and Supply Company, and of rentals received on the jointly owned property through Miriam Hoover Rental Agency from which HME rented terminals. Ruth N. Garrett did know that she received from HME an expense allowance of approximately $150 a month during the years 1956 through 1959 and that she filed an expense report with HME on the basis of which the payments were made that did not conform with the actual manner in which the money she received was expended. Ruth N. Garrett had been told by petitioner that she could draw from HME an expense allowance of $35 to $40 a week not to exceed $150 a month for expenses or to spend as she pleased. Ruth N. Garrett 230 also knew that HME furnished her with an automobile *258 for her personal use during the years here in issue. During the years here in issue the following amounts were paid by HME as salary to petitioner, each of his sisters, Ruth N. Garrett (petitioner's stepmother) and E. Ridley Derryberry (the husband of petitioner's sister Eleanor): Name
1956
1957
1958
1959
Dorothy Milam
$ 7,560.00
$ 4,590.00
$ 3,600.00
$ 3,600.00
Eleanore E. Derryberry
7,800.00
4,650.00
3,600.00
3,600.00
Miriam M. Cole
7,800.00
4,650.00
3,600.00
3,600.00
Ruth N. Garrett
8,328.00
4,872.00
3,720.00
3,720.00
E. Ridley Derryberry
3,900.00
3,900.00
6,500.00
7,020.00
Eph H. Hoover, Jr.
42,608.16
50,832.82
50,000.16
51,489.00
Totals
$77,996.16
$73,494.82
$71,020.16
$73,029.00
The Board of Directors of HME held one or two meetings a year. Petitioner would on occasions discuss the operation of HME with his sisters and his stepmother, Ruth N. Garett, at certain family gatherings. E. Ridley Derryberry was the manager of the Hoover family farm. This farm consisted of about 6,000 acres. There was a stocked lake on the farm. At times officers and employees of HME would take customers or prospective customers of HME to the family farm to fish or hunt. On these occasions E. Ridley Derryberry would assist with the entertainment *259 of the visitors, but otherwise rendered no services to HME. For the fiscal years ended March 31, 1956, through March 31, 1959, the family partnership, Truck Equipment and Supply Company, formed March 1, 1953, filed U.S. partnership returns of income disclosing distributable ordinary income of $26,976, $46,438, $67,622 and $37,701, respectively. These returns showed that the profits of this partnership were distributable one-fifth to trusts for petitioner's children, one-fifth to Ruth N. Garrett, and one-fifth to each of petitioner's three sisters. A schedule attached to petitioner's Federal income tax return for each of the years 1956 through 1959 showed net income from joint ownership of rental property (Miriam Hoover Rental Agency) in the amounts of $76,948.40, $96,255.84, $94,450.56 and $101,999.88, respectively. This income was shown to be distributable in the years 1956 through 1959 to petitioner and each of his sisters in the amounts of $16,950.58, $21,181.28, $20,192.29, and $21,695.28, respectively, and to Ruth N. Garrett in the respective amounts of $9,146.08, $11,530.74, $13,681.39, and $15,218.79. On some occasions petitioner's sisters or members of their families took trips *260 on an airplane owned and operated by HME and no charge therefor was made to their personal accounts on the books of HME. On a few occasions airline tickets for the use of petitioner's sisters or members of their families were charged to the account of HME with no charge therefor made to their personal accounts on the books of HME. In addition to his interest in HME and in the family partnership of Truck Equipment and Supply Company and family-owned property which used the name of Miriam Hoover Rental Agency, petitioner had a number of other business interests. He was part owner of the Hoover family farm during all of the years here in issue, and during all of the years here in issue he individually owned and operated a farm. During the year 1954, petitioner and Roger W. Sanders of Murfreesboro, Tennessee, formed a partnership in which each owned a 50 percent interest, known as Sanders Super Service (hereinafter referred to as Sanders Service). This partnership was engaged in the business of selling auto and truck tires and one of its major customers was HME. Sanders Service filed United States partnership returns of income for the fiscal years ended March 31, 1956, 1957, 1958, and *261 1959 with the district director of internal revenue at Nashville, Tennessee, reporting income of $14,587.37 for 1956, a loss of $5,204.80 for 1957, and income of $37,587.79 and $76,958.61 for 1958 and 1959, respectively, the distributive share of petitioner and trusts for his children being one-half of such income. In 1956 a corporation known as Auto Equipment & Supply, Inc. (hereinafter 231 referred to as Auto), was organized. The only issued stock of Auto was to petitioner. However, John R. Wills (hereinafter referred to as Wills) had some interest in the corporation. Upon the formation of the corporation Wills put $1,000 into the corporation and petitioner put in $3,000. The stated business of the corporation was the sale of auto and truck parts, and during the years here in issue it did make such sales. Petitioner was the sole stockholder of a corporation known as Tidewater Associates, Inc. (hereinafter referred to as Tidewater) which was organized under the laws of the State of Tennessee on January 5, 1957. Tidewater filed its U.S. corporation income tax returns for the calendar years 1957, 1958, and 1959 with the district director of internal revenue at Nashville, Tennessee, *262 reporting taxable income for these years of $6,728.91, $15,551.28, and $23,923.57, respectively. McMinnville Rock Company, Inc. (hereinafter referred to as McMinnville) was organized under the laws of the State of Tennessee on November 23, 1955. One-half of the stock of this corporation was owned by petitioner and the other one-half was owned by Bill E. Hendrixson (hereinafter referred to as Hendrixson). Subsequent to the years here in issue petitioner became the sole owner of this corporation and changed its name to Hoover, Inc. McMinnville filed its U.S. corporation income tax returns for the calendar years 1956, 1957, 1958, and 1959 with the district director of internal revenue at Nashville, Tennessee. McMinnville had a wholly-owned subsidiary corporation known as Kentucky Aggregate Corporation. The business of these two corporations was the production and sale of crushed limestone and other aggregates. McMinnville originally operated in McMinnville, Tennessee, later in Cleveland, Tennessee, and in late 1958 moved its operations to Davidson County, Tennessee. Kentucky Aggregate Corporation's operations were carried on in Paintsville, Kentucky. Petitioner and John L. Burns (hereinafter *263 referred to as Burns) formed a corporation, John L. Burns, Inc., under the laws of the State of Tennessee, on March 20, 1957. It filed U.S. corporation income tax returns for the fiscal years ended January 31, 1958, 1959, and 1960 with the district director of internal revenue at Nashville, Tennessee. This company was engaged in highway construction and owned some equipment. When it was first incorporated and for a while thereafter the equipment which it owned was kept on the personal farm of petitioner, and during some of the years here in issue it kept a bulldozer tractor which it owned on the equipment lot of HME. Most of the equipment used by John L. Burns, Inc., was rented from Burns Equipment Company, Inc., a corporation formed under the laws of the State of Tennessee on March 24, 1958, the stock of which was owned one-half by peitioner and one-half by Burns. The only business of Burns Equipment Company, Inc., was the rental of equipment to John L. Burns, Inc. Burns Equipment Company, Inc., filed its U.S. corporation income tax returns for its fiscal years ended February 28, 1959, February 29, 1960, and February 28, 1961 with the district director of internal revenue at Nashville, *264 Tennessee. Petitioner also owned stock in a corporation, Colorado-Southern Petroleum Corporation (hereinafter referred to as Colorado-Southern), which was formed under the laws of the State of Tennessee on May 23, 1957. This corporation owned and operated certain oil leases, its general area of operations being in Colorado and surrounding states. It filed its U.S. corporation income tax returns for the fiscal years ended May 31, 1959 and 1960 with the district director of internal revenue at Nashville, Tennessee. Wills, with whom petitioner was associated in Auto, and petitioner had known each other since the early 1940's. They were both interested in race cars and auto racing and had met each other through their mutual interest. When Auto was formed in 1956, Wills became the manager of the corporation. He had had prior experience in selling automobile parts and supplies. During the time he managed Auto, Wills continued to do a small business under the name of Inglewood Auto Electric which operated in the same building with Auto. Prior to the time Auto was organized, petitioner had owned certain midget race cars which he raced from time to time at various tracks. Wills had participated *265 in some of the racing activities of these midget cars with petitioner and these activities continued for a while after the organization of Auto. When Auto commenced business, HME advanced to it the sum of $5,000 which amount HME showed on its books as an account receivable. This account receivable continued to appear on the books of HME until after mid-1959 when petitioner and Wills had a disagreement and Wills ceased to be associated with Auto. 232 Petitioner and Wills decided to purchase a larger race car of the type that is raced in the Indianapolis 500 and to enter this car in the Indianapolis races. A bank account had been opened at the First American National Bank of Nashville in the name of Midwest Sprint Car in June of 1954. Wills and Lillian Edwards were the persons authorized to draw on this account. Lillian Edwards was petitioner's secretary in his office at HME and she signed the card authorizing her to draw on this account at petitioner's request, but she never actually drew any checks on the account. The address for Midwest Sprint Car as given to the bank on the account opened in that name was the address which was Auto's address in Nashville after its formation. *266 In 1958 petitioner and Wills purchased a race car from a person by the name of Wallace in St. Louis for $12,000. The car was registered in Wills' name. A downpayment of $4,000 was made on the purchase price and ten notes in the amount of $800 each were executed for the balance due. In each of the years 1957 and 1958 HME paid $4,000 to the Midwest Sprint Car account. The notes for the race car purchased in 1958 were executed by Wills and endorsed by petitioner. The payments of these $800 notes were made in 1958 with money obtained by the submission of invoices from Auto to HME, there being no merchandise actually delivered on these invoices even though the invoices were paid by HME. Edith P. Orrand (hereinafter referred to as Orrand) was employed by Auto as a bookkeeper. She had been interviewed by W. C. Hembree (hereinafter referred to as Hembree), the chief accounting officer of HME, who assisted her in installing a bookkeeping system for Auto. Orrand actually prepared the invoices to obtain the money for the race car. She was instructed by Wills to and did select from a parts catalog certain parts which would be listed on an invoice to HME which she would send over to HME for payment. *267 No parts as listed on the invoice would be delivered but the invoice would be paid by HME. Sometimes Wills, himself, would prepare these fictitious invoices. HME during the years here in issue actually bought parts from Auto which parts would be billed to HME on Auto's invoices which would be sent through the parts department of HME for payment in regular course. The majority of fictitious invoices were sent or taken by Wills directly to Hembree who would approve them for payment. Hembree had heard petitioner and Wills discussing auto racing, and he assumed the invoices which Wills submitted to him were to be paid in order to obtain race car funds. When Wills would submit such an invoice to Hembree, Wills would tell Hembree he needed money and Hembree would secure petitioner's permission to approve and pay the fictitious invoice. In late 1957 or early 1958 when negotiations were taking place for the purchase of the larger race car, petitioner delivered to Wills and Orrand a series of invoices numbered in the 15,000's. Petitioner told Wills and Orrand that these invoices were to be kept under the counter and were not to be used when actual items were sold by Auto, but were to be used *268 for the fictitious sales to HME. Some of the receipts on other fictitious invoices presented by Auto to HME and paid by HME were included by Auto in its income as reported on its income tax returns. However, none of the payments which were made by HME to Auto for amounts billed for fictitious items on the 15,000 series of invoices was entered on the books of Auto and none of the amounts so paid was in any way included in Auto's income. Wills knew that the 15,000 series of invoices were for the purpose of obtaining funds for the race car. On one or two occasions Orrand mistakenly included a legitimate invoice from Auto to HME with the fictitious invoices and when this occurred Orrand would be severely reprimanded for the mistake and advised to cash the check of HME for the total payment so that the funds from the legitimate and fictitious invoices might be separated and none of the race car funds entered on the books of Auto. The cash insofar as it represented payments of fictitious invoices would usually be deposited in the Midwest Sprint Car account. Sometimes worthless items such as old batteries or jacks would be picked up by Auto at Sanders Service and delivered to HME along with *269 invoices billing the items to HME. These invoices would be paid by HME and sometimes the worthless items would be returned by HME to Auto and billed out again by Auto to HME. The race car financed through the fictitious invoices to HME was run in the 1958 race at Indianapolis and again in the 1959 race. In both races the name of HME was shown on the car in the black and orange colors which HME used on its trucks. 233 The race car bearing the name of HME placed fourth in the 1959 Indianapolis race and after it was returned to Nashville was displayed in the window of one of Nashville's leading downtown department stores. When Wills returned from the 1959 Indianapolis race, Fred Capshew (hereinafter referred to as Capshew), who had been employed by HME under circumstances hereinafter set forth to work directly for petitioner, informed him that he was no longer to remain the manager of Auto. The race car had not been returned from Indianapolis, and since the car was registered in Wills' name, Wills called the persons who had custody of the car and refused to grant permission to have any person obtain the car without his consent. Discussions took place between Capshew and Wills. Wills *270 insisted that he was part owner of the race car and also that he should be paid for the work he had done. Finally, a settlement was reached whereby Wills was paid $4,000, certain obligations which Capshew contended Wills owed to Auto were cancelled, title to the race car was transferred to Auto, and Wills relinquished any claim to any interest he might have in Auto. Capshew would not permit Wills to see the records of Auto when Capshew and Wills were discussing the settlement of their differences. Harold J. Frensley (hereinafter referred to as Frensley) was employed by Auto from October 1958 throughout the balance of the years here in issue. He originally was employed as a stock clerk and later as a counterman. He handled, in many instances, orders from HME to Auto for parts. Very often HME would order a part from Auto which Auto would not have. Auto would then order the part from a supplier who would ship the part to HME, and HME would be billed on a legitimate invoice for the part. HME was the major customer of Auto and Frensley prepared many of the invoices of Auto to HME. Orrand was discharged at the same time that Wills left Auto. For a short while Capshew looked after the affairs *271 of Auto, and then Herschell K. Spann (hereinafter referred to as Spann) was employed as Auto's manager. After Spann became manager, he would on occasions direct Frensley to prepare fictitious invoices to HME, billing HME for parts which were not delivered either by Auto or a supplier to HME. Spann would tell Frensley the amount for which the invoice was to be made out and Frensley would then make up the fictitious invoice. Generally, such invoices were made for amounts from $200 to $300. Spann gave the directions to Frensley to prepare the fictitious invoices in accordance with his directions from Capshew. Toward the end of 1959 Hembree called to petitioner's attention the outstanding account receivable in the amount of $5,000 on the books of HME which represented the advance made by HME to Auto for parts. Petitioner advised Hembree that he would check on this account. Thereafter, at Capshew's direction, Spann prepared Auto invoice No. 26851 in the amount of $1,849.80, dated November 27, 1959, for pressure plates and had Frensley prepare Auto invoice No. 26840 in the amount of $3,150.20, dated December 23, 1959, with the designation, "batteries." These invoices were fictitious and *272 no pressure plates or batteries were actually delivered to HME under these invoices. The two fictitious invoices were given by Spann to Capshew. These two invoices were approved by the shop superintendent of HME, and when they were received by Hembree, he credited the amounts against the $5,000 advance to Auto appearing on HME's books. The fictitious invoices in the 15,000 series paid by HME to Auto in the year 1958 totaled $15,907.61, and in 1959 totaled $1,830.72. Other invoices of Auto to HME in the total amount of $2,221.06 for the year 1958 were for items not specifically identifiable as to usage. On the income tax return of HME for the calendar year 1958, there appears an item under advertising expense of $4,146.19 explained as "Race Car Signs Etc." In 1959 HME paid certain expenses in connection with the race car directly, the total amounts so paid being $10,631.52. After the notes for the race car had been paid, Wills, at petitioner's instruction, tore off the portion of each note which bore petitioner's endorsement and retained the balance of the note marked, "paid." Shortly after the title to the race car was transferred by Wills to Auto, Auto transferred title to Tidewater. *273 HME and Tidewater executed a contract dated June 1, 1959, regarding HME's sponsoring the racing. Under this contract HME agreed to pay Tidewater $500 a month plus expenses incurred in owning and operating "one or more race cars in open competition." HME continued to sponsor the race car until Ryder took over the management of HME in September 1961. 234 After HME ceased to sponsor the race car, Tidewater entered into an agreement with Bryant-Hedback Company to sponsor the race car for the 1962 Indianapolis 500 Race whereby that sponsor agreed to pay Tidewater $8,750. It is not uncommon for companies to sponsor racers in the Indianapolis 500 Race for the publicity obtained through the sponsorship. The amounts paid to sponsor a race car in the Indianapolis 500 Race vary widely depending upon the car sponsored, but amounts ranging from $10,000 to $20,000 for the sponsorship of a car are not uncommon. Several months before Orrand was discharged from her employment with Auto, she was directed to issue checks of Auto to various individuals who were not employees of Auto but who were employed either at petitioner's home or on his farm. Also, an employee of Auto, at petitioner's direction *274 would order groceries from C. B. Ragland Company to be delivered to petitioner's home, and invoices of Auto to HME would then be drawn listing merely a number which would be the item number shown on the Ragland invoice to Auto but would not otherwise designate what was covered by the invoices. HME would then issue a check to Auto on these invoices and Auto would pay Ragland for the groceries. The invoices from Auto to HME covering the grocery orders were prepared either by Orrand or Frensley. Checks issued by Auto to C. B. Ragland Company in 1958 totaled $926.32, and in the year 1959, $1,637.04. When HME was being audited by independent certified public accountants for the year 1959, the grocery item of $1,637.04 was discovered by the auditors and called to Hembree's attention. Hembree advised petitioner that the auditors had called this item to his attention and petitioner's personal account on the books of HME was charged under date of December 31, 1959, for the groceries purchased for petitioner by HME in 1959 in the amount of $1,636.44. [5] *275 Although petitioner had a personal account on the books of HME, as did his three sisters and Ruth N. Garrett, his stepmother, the charge in 1959 for the groceries for which HME had issued checks to Auto and Auto checks had been issued to the grocery company, is the only charge against petitioner made to his personal account on the books of HME during any of the years here in issue. Sometime prior to December 31, 1955, a charge had been made by Hembree to petitioner's personal account on the books of HME and petitioner had instructed Hembree not to charge anything to his personal account on the books of HME unless petitioner specifically instructed him to make such a charge. Hembree would show petitioner his personal account on the books of HME at the end of each year and on occasions at other times. On or about October 29, 1957, Johnnie Billingsley Hoover (now Johnnie Billingsley Shannon who is a petitioner in two of these cases), who will hereinafter be referred to as Johnnie, filed a bill for divorce against petitioner in the Fourth Circuit Court of Davidson County, Tennessee, in which, among other things, she asked that she be awarded the custody and control of the minor *276 children, that she be awarded alimony, a reasonable solicitor's fee and support and maintenance for the minor children, and that she be granted an absolute divorce. On February 21, 1958, Johnnie was granted a divorce from petitioner. The decree granting the divorce did not award Johnnie any child support or alimony, but in explanation it contained the following statement: * * * No specific amount of money is fixed and required of the defendant to be paid to the complainant for the maintenance and support of said children, it having been represented to the Court that the defendant is able and willing to adequately support them voluntarily and without the requirement of such provision in this decree. In accordance with the statute, however, this matter is retained in Court for such further orders as the care, custody and welfare of the minor children may require. It further appearing to the Court that the complainant and the defendant have made and entered into a property settlement satisfactory to themselves, the terms of which were fully made known to the Court. Said agreement is hereby approved and therefore, no award of alimony for the complainant is herein provided. Generally in *277 divorce cases filed in the Fourth Circuit Court for Davidson County, Tennessee, the terms of any property settlement between the parties are either encompassed or referred to in the divorce decree entered in the case. At the hearing on Johnnie's bill for divorce from petitioner, her attorney 235 advised the Court that the property settlement reached between the parties called for petitioner's purchase of the Knoxville Terminal from HME with a leaseback of the terminal to HME at a monthly rental of $1,500 of which Johnnie was to receive twothirds and the remaining one-third was to be divided equally among the children under a trust agreement. Johnnie was present in the Courtroom when her attorney made the above representation to the Court. On February 20, 1958, petitioner as president of HME executed a warranty deed which recited that in consideration of the sum of $65,000, of which $40,000 had been paid in cash, and for the balance of which the grantees had executed a promissory note for $25,000, without interest, payable in equal monthly installments of $138.88 for 180 consecutive months beginning April 1, 1958, HME sold, transferred and conveyed to Johnnie a two-thirds undivided *278 interest and to the trustees for Eleanor Lois Hoover, E. H. Hoover III, and Thomas Samuel Hoover a one-third interest in certain specifically described property which was the real property on which the Knoxville Terminal which had been built and was being used by HME was located. Following the description of the property the deed recited that the grantees were "TO HAVE AND TO HOLD the said tract or parcel of land, with the appurtenances, estate, title and interest thereto belonging * * *." No reservations of leasehold improvements were made in the deed. On February 20, 1958, HME executed a lease agreement with Johnnie and the trustees for the three Hoover children whereby the lessors leased to the lessee for a period of 30 years beginning March 1, 1958 and ending the last day of February 1988, for the sum of $540,000, payable in monthly installments of $1,500 each, the first installment being due and payable the first day of March 1958, the specifically described property which was the Knoxville Terminal used by HME. The lease recited that the lessors were indebted to the lessee in the amount of $25,000 payable at the rate of $138.88 per month, without interest, the first such payment *279 being due April 1, 1958, and that it was expressly agreed that the lessee may and was authorized to credit each monthly rent installment of $1,500 with the monthly payment of $138.88 due from the lessors to the lessee and to pay the remainder of each rent installment to the lessors in satisfaction of the rental payment. The lease provided that the lessee would pay all taxes and assessments of every kind and nature, levied or assessed against the premises or any improvements thereon, the payment to be made in the name of the lessors. The lease further provided that the lessors should not be required to maintain the premises or any part thereof and that the lessee agreed to keep the premises in a good state of repair and properly maintain the premises during the term of the lease, but the lessee should not thereby acquire any interest in the premises or in improvements thereon. The lessee further agreed during the term of the lease, or any renewal or extension thereof, to keep the premises adequately insured against fire, windstorm and other comprehensive casualty loss with a reputable insurance company in an amount sufficient to replace the buildings and other improvements on or thereafter *280 to be placed on the premises. The lease provided that the lessee should have the privilege of renewing the lease for a term of 15 years at the expiration of the present term and that if the lessors determined to sell the premises at a private sale, the lessee should be given a reasonable opportunity to meet any proposed sale price. HME had acquired the land and land rights upon which the Knoxville terminal was built in 1956 at a cost of $21,235.57. In 1957 HME completed the construction of its Knoxville terminal building at a total cost of $76,254.08. The journal record of HME shows the following with respect to the conveyance of the Knoxville terminal to Johnnie and the trustees for the Hoover children and the lease of the terminal: March 1958
Debit
Credit
Account No. 1000-19-1 Bank
$40,000
Account No. 1270 - Improvements to leasehold property
31,004.50
Account No. 1650-9 Advances to Mrs. Johnnie Hoover
25,000.00
Account No. 2510 - Reserve for depreciation - structures
1,485.15
Account No. 1201 - Land and land rights
$21,235.57
Account No. 1210 - Structures
76,254.08
To record deposit of 2/21/58 E. H. Hoover check No. 307 and record lease agreement between Hoover Motor Express and Johnnie Billings- ley Hoover for rental of Knoxville terminal. Lease for 15 years 3/1/58 through 2/28/73 for $270,000.
Ordinarily *281 any leases which HME has on real property are for periods of 5, 10, or 15 years and it is unusual for HME to execute a lease for real property for a period of 30 years. On October 30, 1956, pursuant to its application for title insurance, HME had obtained a commitment for title insurance in the amount of $200,000 on its proposed Knoxville terminal building and the real estate on which it was to be built. On May 22, 1958, Johnnie and the trustees for the Hoover children obtained a title insurance policy in the amount of $83,995 on the Knoxville terminal property. As of the date of the trial of this case, Johnnie and the trustees for the Hoover children still owned the Knoxville terminal and were still receiving the rental provided for in the lease agreement entered into between HME and Johnnie and the trustees for the Hoover children on February 20, 1958. Petitioner suggested the transaction of the transfer of the Knoxville terminal to Johnnie. Prior to this transaction HME had built terminals and sold them to the stockholders of HME. In some of these sales, HME had retained certain leasehold improvements. The Knoxville terminal had been completed around 3 months before it was transferred *282 by HME to Johnnie and the trustees for the children. Sometime in mid-1958 petitioner requested Hembree to interview Capshew. Petitioner informed Hembree that he wished to employ an individual who was a good accountant and that this individual would be paid a salary by HME but he would also do accounting work for petitioner's other business interests. Capshew was a CPA and Hembree thought he would be a satisfactory employee. Petitioner on three separate occasions personally interviewed Capshew and finally Capshew was interviewed by the director of personnel of HME, and it was HME's director of personnel who told Capshew to report to HME for work. During his interviews with personnel of HME, Capshew was told that he would not be placed in the accounting department of HME. He was told that he would occupy a desk outside of petitioner's office and that he would do whatever work was specifically assigned to him by petitioner. After he was employed, Capshew did occupy a desk in HME's office just outside of petitioner's office. He opened all mail that came addressed to petitioner at HME and answered some of this correspondence and performed such other duties as petitioner requested him to *283 perform. Other than opening and replying to mail which was addressed to petitioner at his office at HME, Capshew had no routine duties for HME. Capshew was an officer of Burns Equipment Company, Inc., John L. Burns, Inc., Auto, McMinnville, and Tidewater. He was authorized to countersign checks for Auto, Tidewater, McMinnville, and Colorado-Southern. From October of 1958 through December 1959 Capshew kept the records of Tidewater. Capshew performed some accounting duties for McMinnville, John L. Burns, Inc., Auto, and the Miriam Hoover Rental Agency. As heretofore set forth he represented petitioner in the disagreement between petitioner and Wills. In 1959 and for a short while after Wills left Auto, Capshew managed Auto. Capshew handled the receipts of rentals for the Miriam Hoover Rental Agency, paid the bills of that agency and negotiated for any repairs and remodeling work which was needed on real estate. Petitioner, his sisters and stepmother, jointly owned other real estate which was handled under the designation, "Miriam Hoover Rental Agency," as well as the terminals which were listed under the Miriam Hoover Rental Agency designation. Capshew never made any trips away from *284 Nashville for the purpose of transacting business for HME. However, on some occasions when he was away from Nashville in connection with other work, he would transact some business for HME. Capshew during 1958 and 1959 made several trips out of town in connection with petitioner's race car interests. In 1958 and 1959 Capshew made trips to Denver, Colorado in connection with the oil interests of Colorado-Southern and some personal oil interests of petitioner. Capshew prepared or assisted in the preparation of the income tax returns of some of the corporations in which petitioner owned an interest. Whenever Capshew took a trip out of town, his airplane ticket or other transportation expense would be paid directly by HME and he would file an expense report with HME for his other expenses and the amount shown on the report would be paid by HME. Occasionally Capshew would get an advance from HME for expenses which would be credited on his expense report. Capshew's claims for expense reimbursement were prepared on a form furnished to 237 employees by HME entitled, "Expense Report." This same form was used by other employees of HME including Hembree, the chief accounting officer of HME, *285 and Dan O. Turner, Jr. (hereinafter referred to as Turner), the company pilot, and was also the same form used by petitioner for expense reports. The document at the top bore the legend, "Hoover Motor Express Co., Inc." and underneath were the words "Expense Report." Then followed "Name" with a blank space, "For week ending" with a blank space, "Position" with a blank space, and "Terminal" with a blank space. There was a separate column denominated with each day of the week, Monday through Sunday and a column for the total. There was a heading, "Traveling expense" below which were drawn lines for breakfast, lunch, dinner, taxicab fare, parking & storage, hotel room and various other items, the last item under this designation being "Solicitation expense"and in parentheses "Must be detailed in space provided below." On the bottom half of the same page was the title "Detail of solicitation expense," a notation, "Receipted bills must be attached," and underneath the title a space for "date," "Name of customer," "Kind of expense," and "Amount," a blank space beside the designation "Signed," a notation of "Approved by" with a blank line under which was "General Manager" and another blank *286 line under which was "Sales Manager" and at the bottom the notation, "This Report Must Be Completed and Signed Before Reimbursement Can Be Made." Shortly after Capshew began his employment at the offices of HME, petitioner began to hand him certain personal and family bills, instructing him to pay these bills in cash and to recoup the amount he spent by increasing items on his expense report to HME. During the period from October 1958 through December 1959 Capshew paid certain doctor, drug, radio repair bills, and various other personal bills of petitioner and his family in cash and increased his weekly expense report filed with HME by the amounts he spent in this manner. The amount of each weekly expense report including increases for the payments made for petitioner's personal bills was paid by HME to Capshew. Generally the bills which Capshew paid in this manner for petitioner were small bills. One of Capshew's regular duties was to make deposits in petitioner's personal checking account, prepare checks on this account for petitioner's signature in payment of various bills of petitioner, and check petitioner's bank statements regularly for accuracy and comparison with the stub of *287 checks. With one exception, none of the expense reports submitted by Capshew to HME contained any supporting documents such as hotel bills, receipts, or the like. One of his expense reports did have attached to it a hotel bill. The items which Capshew included in his expense reports to receive reimbursement for personal bills paid for petitioner were interspersed with actual expenses Capshew had in connection with travel and related expenses. During the year 1958 Capshew was paid by HME a salary of $2,100 and a total amount of $432.14 as reimbursement on expense reports. During the year 1959 Capshew was paid by HME a salary of $9,000 and a total amount of $5,980.54 as reimbursement on expense reports. From sometime prior to 1956 through 1959 petitioner kept no record of the expenses which he incurred in travel or in entertainment or other expenses which he might have had in connection with his position as president of HME. During the years 1956 through 1959 petitioner filed with HME an expense report on the same form as the report heretofore described as being filed by Capshew. One such report was filed by petitioner for each week during each of the years 1956 through 1959. Generally *288 the total amount shown on the report ranged from $200 to $225 although there were some of the reports for slightly less amounts and some for slightly higher amounts. During the years 1957, 1958, and 1959 petitioner's expense reports for each week were prepared either by Hembree, the chief accounting officer, or Turner, the company pilot. A few of the reports for 1956 were prepared by Turner and a few by Hembree. The remainder of the reports for 1956 were handwritten reports not in petitioner's handwriting. When Hembree made out petitioner's expense report, petitioner would usually tell Hembree the total amount to include on the report and give him no further information. Hembree would spread figures over various days on the report to total the amount which petitioner told him should be the total amount reported as his expenses. Occasionally petitioner would not tell Hembree the amount to be used on the report and since the reports averaged from $200 to $225 a week, Hembree would generally use an amount in that range for such report. 238 When Turner made out petitioner's expense report, petitioner would usually advise him of the total amount and he likewise would spread it over various *289 items without reference to any actual knowledge of expenditures made by petitioner. Petitioner made some trips for HME on which he incurred travel expenses and incurred certain other expenses for HME. HME was one of the major freight carriers in the United States. Its main office was in Nashville, Tennessee and it also had a terminal there. In addition it had terminals and maintenance facilities in St. Louis, Memphis, Louisville, Cincinnati, Birmingham, Atlanta, Chattanooga, Knoxville, Indianapolis, Chicago, and Milwaukee, and a number of other smaller cities in the same general area. Petitioner also traveled in connection with the business activities of his other business interests such as McMinnville, John L. Burns, Inc., Colorado-Southern, and his own personal oil investments in Colorado. He also traveled to car races and in connection with other race car activities. HME had a general manager and a sales manager whose duties were the general supervision of HME's business and the sales and promotion of HME's services. Petitioner as chief executive officer made policy decisions for HME and performed such other functions as he deemed necessary. During the years here in issue HME owned *290 an airplane and employed a fulltime pilot. Turner was the full-time pilot employed by HME from August 1956 throughout the years here in issue. When Turner was originally employed by HME the company owned an older Aero Commander airplane, and in 1957 bought a new Aero Commander airplane and sold the old one. The new airplane could carry six passengers in addition to the pilot. Petitioner himself was a licensed pilot. There were also two or three other employees of HME who were licensed pilots. However, generally when petitioner flew on the HME airplane, Turner would be the pilot. Petitioner as chief executive officer of HME had first call on the company airplane but the airplane was regularly used without petitioner being aboard by other employees of HME including the sales manager and general manager. Ordinarily, when petitioner and Turner were together on a trip, Turner would pay all the expenses for both of them and at times for other persons who were with them. Turner did this in order to relieve petitioner from the time which would be consumed in making such payment. Turner usually paid all meal checks, hotel bills, and other expenses incurred by the groups that were traveling. *291 Turner had an American Express credit card, several automobile rental credit cards, gasoline credit cards, and other credit cards for charging items to HME. He was reimbursed by HME for the payments he made for petitioner or groups traveling with petitioner when such payments were not charged directly to HME. At times, Turner paid expenses for groups traveling on the HME plane when petitioner was not a member of the group but the group included business guests of executives of HME. Petitioner was furnished by HME with two automobiles which were purchased and maintained by HME. He was also furnished with various credit cards such as cards of the major oil companies, various hotels, automobile rental companies, airlines, and American Express Company. Charges on these cards were made directly to and paid directly by HME. During the year 1957 HME paid directly to Bozeman's Restaurant on Murfreesboro Road in Nashville, Tennessee, the amount of $121.91 for breakfasts, lunches and dinners. The statements showed that the charges were for meals ordered by petitioner on January 11 and 23, February 7 and 21, March 2, April 30, May 12, July 9, 16, 27, 28 and 29, August 1 and 29, October 10 and *292 25, November 11, 15, and 19 and December 4, 6, 7, 8, 11 and 18. On most of these dates petitioner on his expense voucher claimed reimbursement for the same meal or meals which he had ordered at Bozeman's Restaurant. During the years 1958 and 1959 there were certain weeks when petitioner's expenses paid directly by HME covered room and meals for the full week. Petitioner's expense reports for these same weeks were in amounts ranging from $200 to $225. Items of expense are listed on petitioner's expense reports for many days when he was on a one-day trip on the airplane with Turner on a day when Turner would turn in a sum for meals for himself and other members of the party on the airplane. Likewise, petitioner has expense reports for weeks when he would be away on the airplane with Turner for the major portion of the week. There are also expense reports for weeks when airplane tickets used by petitioners were billed directly to HME as 239 well as his hotel bills for room, meals, and incidental expenses. For the years 1958 and 1959 certain bills from Bozeman's Restaurant for various days when expenses are also covered by petitioner's expense reports are in the record. Most of the flight *293 reports kept by Turner for the years 1958 and 1959 are in the record. The flight reports that are in the record disclose flights actually made by Turner as pilot for HME, but there may be some reports missing for 1958 and 1959. Also, petitioner may have flown in some instances on the plane without Turner being the pilot. During 1958 petitioner made at least 18 trips on HME's company-owned airplane with Turner as the pilot. On January 18, he made a trip from Nashville to Lexington and return; on March 25, a trip from Nashville to Birmingham and return; on March 26, a trip from Jacksonville to Nashville and from Nashville to Chicago and return, both trips being completed on one day; on February 12, he flew as co-pilot of the plane with Turner as pilot from Nashville to Indianapolis to Cincinnati and return to Nashville; on April 25, he made a one-day trip from Nashville to Chicago and return and also a trip from Nashville to Jacksonville and return on the same day. On May 9, he flew from Nashville to Hattiesburg and Miami and returned from Miami to Nashville as co-pilot of the plane; on May 10, he flew as co-pilot of the plane from Nashville to Indianapolis and return to Nashville; on *294 May 12, he flew as a passenger from Nashville to McMinnville to Cleveland to Indianapolis to McMinnville, returning to Nashville on the same day. On September 5, he flew as Turner's co-pilot of the plane from Nashville to Cedar Rapids, returned to Nashville, and on the same day flew from Nashville to McMinnville to Cleveland and returned from Cleveland to Nashville. On September 14, he left Nashville at about 1:30 p.m. on the plane as Turner's co-pilot and flew to Indianapolis, returned from Indianapolis to Nashville, took a night flight from Nashville to Akron and flew back from Akron to Nashville on a night flight, arriving in the morning of September 15. On September 17, he flew as co-pilot to Turner from Nashville to Somerset and returned to Nashville on the same day. On October 7, he flew as copilot to Turner from Nashville to Owensboro and returned to Nashville; on October 8, he flew as Turner's co-pilot from Nashville to Decatur and returned to Nashville on the same day; and on a date between October 8 and 15 (exact date not designated on the flight report) he flew from Nashville to Jacksonville and returned to Nashville on a one-day trip. On October 15, he flew as Turner's *295 co-pilot from Nashville to Somerset to Danville and returned to Nashville on a one-day trip. On October 22, he flew as Turner's co-pilot from Nashville to Memphis, from Memphis to Birmingham, and from Birmingham back to Nashville on a one-day trip. On November 6 and 7, he made a flight as co-pilot to Turner to a destination not shown on the flight report, and on December 18 he flew as co-pilot to Turner from Nashville to Somerset, from Somerset to Athens, from Athens to Cleveland, and back to Nashville on a one-day trip. The expense voucher filed by Turner for the week ending March 8, 1958, showed expenses for March 5, of $24.50 consisting of cost of dinner and tip. This voucher also showed under solicitation expense an amount of $105 and under name of customer and kind of expense appeared a notation which is partially illegible, the first three words being "Sales meetings with -." Turner's expense report for the week ending April 12, showed expenses for April 12 of $11.65 under the designation, "breakfast, lunch, taxicab fares, tips, and phone." Turner's expense report to HME for the week ending April 26, 1958, showed expenses for April 25, totaling $42 listed under the designation, *296 "breakfast, lunch, dinner, and tips." Turner's expense report for the week ending May 10, 1958, showed total expenses of $693.73, which included for May 8, 9, and 10 under the designation "three groups of rooms," the amounts of $249.61, $82.55, and $131.57, respectively. The amount also included other charges for lunch, parking, storage and tips in an amount of $30.35 for May 8, $21.25 for May 9, and $18 for May 10. Turner's expense report for the week ending May 16, 1958 showed expenses for May 12 of $19.75 of which $18.75 was for lunch and tips and $1 storage. Turner's expense report for the week ending September 6, 1958, showed expenses for September 5 in the total amount of $74 consisting of $15 for parking and storage and the balance for breakfast, lunch, dinner, and tips. Turner's expense report for the week ending September 13, 1958, showed expenses for September 10 of $7.25 consisting of breakfast, lunch, and tips. Turner's expense report to HME for the week ending October 18, 1958 showed expenses for October 15 totaling $38 of which all except $3 240 for cab fares and $1 for plane supplies consisted of breakfast, lunch, dinner and tips. During the year 1958 HME paid directly *297 a bill to the Palmer House in Chicago, the voucher for the payment being dated August 8, 1958, and the bill consisting of a room for petitioner and his wife at the rate of $21 per day for June 26 through July 1, together with restaurant charges and a few telephone charges, the total bill being $294.74. On August 23, 1958, HME paid directly to the Sierra Motel at Fort Lauderdale, Florida an amount of $33.56 which consisted of lodging for two days at $16 a day plus tax and a small phone charge for petitioner, his wife, and children for August 7 and 8, 1958, and on October 7, 1958, HME paid a bill in the amount of $823.18 directly to the Castaway, Miami Beach for petitioner and Turner from August 8 to August 18. On November 5, 1958, HME paid an additional $15 directly to the Castaway covering this period of time. On September 11, 1958, HME paid directly to Holiday Shores, Daytona Beach, Florida, a bill for one room for Turner for August 18 and two rooms for petitioner for August 18, together with a bar charge and telephone calls, the total amount being $53.02. During the year 1958 HME paid directly to Bozeman's Restaurant on Murfreesboro Road in Nashville, Tennessee a total amount of *298 $173.90 on account of charges most of which were made by petitioner. The charges for which these payments were made consisted of such items as breakfasts, lunches, dinners, and sandwiches, and the dates on which orders were shown as made by petitioner were March 12, 15, 17 and 18; April 6, 8, 20, and 21; May 9, 11, 18, 19, and 21; July 13 and 16; August 7; September 29; and October 8, 12, and 21. During the year 1959 petitioner made at least 32 trips on the plane owned by HME with Turner as the pilot of the plane. On January 25 petitioner flew from Nashville to Boston as Turner's co-pilot on a nonstop flight. On January 30, he returned from Boston to Nashville as a passenger with Turner's co-pilot listed as Tommy Hoover. On February 5, petitioner flew with Turner as pilot on a one-day trip from Nashville to Atlanta and return to Nashville; on February 12, he flew as a passenger with Turner as pilot from Nashville to Louisville and return to Nashville. On March 30, petitioner, along with Wayman Hill and Wayman Hill's wife, flew one way with Turner as pilot from Nashville to Daytona, Florida. On April 2, petitioner flew as Turner's co-pilot from Nashville to Daytona, from Daytona to *299 Miami, and from Miami back to Nashville all in one day. Listed as visitors on this trip were Wayman Hill and wife. On April 20, petitioner flew as Turner's co-pilot from Nashville to Louisville and return to Nashville on a one-day trip, and on May 1, flew as Turner's co-pilot from Nashville to Frankfort and return to Nashville. On May 9, he flew as Turner's co-pilot from Nashville to Indianapolis and return to Nashville, and on May 10 again flew on a one-day trip from Nashville to Indianapolis as co-pilot to Turner. On May 17 he returned in the plane with Turner as pilot from Indianapolis to Nashville and flew from Nashville to Indianapolis and returned to Nashville in one day. On May 18 he flew with Turner as pilot from Nashville to Frankfort, from Frankfort to Somerset, and from Somerset to Nashville, and on May 22 he flew as Turner's co-pilot from Nashville to Indianapolis and return. On May 23 he flew as a passenger on a one-day trip from Nashville to Indianapolis and return to Nashville and on July 2 flew as a passenger from Nashville to McMinnville, from McMinnville to Athens, from Athens to Somerset, from Somerset to Nashville, from Nashville to "MSL", returning to Nashville *300 on a one-day trip. On July 9, he flew as a passenger from Nashville to Indianapolis and return, and on July 20 flew as a passenger from Nashville to Indianapolis and return on a one-day trip. On August 28 he flew as Turner's co-pilot from Miami to Nashville and from Nashville to Chicago, and on August 30, flew from Chicago to Milwaukee and from Milwaukee to Nashville as Turner's co-pilot. On September 23 he flew as a passenger from Nashville to Louisville and return on a one-day trip, and on October 5 he flew as a passenger on a one-day trip from Nashville to Cincinnati, from Cincinnati to Louisville and return to Nashville. On October 8 petitioner flew as a passenger from Nashville to Louisville and return to Nashville on a one-day trip. On October 15 and 16 petitioner flew as a passenger from Nashville to St. Louis to Denver and return from Denver to Nashville. On November 11, petitioner flew as a passenger from Nashville to Denver and on November 14, returned from Denver to Nashville. On November 30, and December 1 and 2, petitioner flew as a passenger from Nashville to Miami, from Miami to Jacksonville, and from 241 Jacksonville to Nashville. On December 14 petitioner flew as *301 a passenger from Nashville to Tulsa and on December 18 returned from Tulsa to Nashville as a passenger in the plane. On December 19, petitioner flew as a passenger from Nashville to Lexington and [returned] to Nashville on the same day. In addition to these flights there is contained among the flight logs a flight report which under date shows three days in September. This report shows Turner as pilot and petitioner as co-pilot and shows the flight as being from Nashville to Lexington, from Lexington to Cincinnati, from Cincinnati to St. Louis, and from St. Louis to Nashville. Turner's expense report for the week ending January 31, 1959, shows total expenses of $385.15 which covers breakfasts, lunches, dinners, taxicabs fares and tips for the period January 25 through January 30, the amount of $28.15 listed as "Hotel room - Bal. on Bill," items totaling $53.10 listed under Sunday, February 1, an amount of $15 listed as plane supplies and expenses, and an amount of $92.50 listed under solicitation expense with the designation, "Flake Montana Chem. Co. Club bills 4 acations occasions." Turner's expense report for the week ended February 14, 1959, included an amount of $15 for breakfast, *302 lunch, dinner, taxicab fare, and tips for February 12, and his expense report for the week ending April 3, 1959 included an amount of $34.25 for breakfast, lunch, and tips on March 30, 1959. Turner's expense report for the week ending November 14, 1959, included expenses for breakfasts, lunches, dinners, taxicab fares and tips for November 11 through 14 of $102.60. Turner's expense report for the week ending December 5, 1959, included expenses for November 30 through December 2 for breakfasts, lunches, dinners, and tips in the total amount of $61.35. During the year 1959 HME also paid bills at Bozeman's Restaurant in a total amount of $87.57 for such items as breakfasts, sandwiches, and dinners, orders for which were given by petitioner on April 29; July 20, 23, 24, 27, 28, and 29; August 4 and 11; September 2, 9, and 29; and October 14, 15, and 20. On March 3, 1959, HME paid directly to the Chateau, Miami Beach, Florida, an amount of $295.95 listed as room for petitioner from January 7 through 14, 1959, together with phone and restaurant charges. On April 15, 1959, HME paid directly to Holiday Shores, Daytona Beach, Florida, a bill of $16.78 listed as "Dan Turner 3-31-59," and on *303 May 15, 1959, paid directly to Holiday Shores, Daytona Beach, Florida, an amount of $217.05, listed as being for Dan Turner, April 5, 1959. On April 16, 1959, HME paid directly to Aztec Resort Hotel, Miami Beach, Florida, an amount of $219.64 which was for an account rendered for room for petitioner and his wife for April 5, 6, and 7, with incidental charges, a room for a "Miss Dot Varner" for the same dates, and a room for the same dates for Dan O. Turner, Jr., together with such charges as bar, coffee shop, and telephone. On June 10, 1959, HME paid directly to the Sheffield Inn, Indianapolis, Indiana the amount of $147.45 representing cafe charges and room services for May 30, 1959. On June 23, 1959, HME paid an amount of $70.55 to American Express Company consisting of charges made by petitioner on May 29, 1959 at the Larue Supper Club at Indianapolis, Indiana in the amount of $50.55, and a room on May 29, 1959, at the Gateway Motel, Indianapolis, Indiana in the amount of $24. On October 26, 1959, HME paid to American Express Company a charge made by petitioner to his American Express card on August 30, 1959, at the Aztec Resort Hotel, Miami Beach, Florida in the amount of $321.12. *304 On November 17, 1959, HME paid directly to the Aztec Resort Hotel, Miami Beach, Florida an amount of $277.08 designated as "Account of E. H. Hoover, Jr." HME by vouchers bearing various dates in 1959, paid charges made by petitioner at the Lighthouse Restaurant in Maimi Beach, Florida as follows: January 7, $20.67; April 5 and 7 totalling $78.55; August 20, 21, 22, 24, 25, 27, 28, and 29 totaling $165.22; October 14, $20; and November 30, $18.10. Officers of HME other than petitioner and Hembree, whose expense account reports will be further discussed, were given expense allowances or reimbursed for expenses by HME. The reports made by HME to the ICC disclose the following with respect to such allowances for the years indicated: 242 Year and name
Position
Expense Allowance
1958
S. W. Barton
Vice President
$ 600.00
R. A. Holter
Vice President and general manager
5,044.51
C. G. Parsley
Vice President (Sales)
11,949.04
W. R. Jones
Vice President (Traffic)
2,089.21
Judson Harwood
Vice President
2,663.11
1959
R. A. Holter
Vice President and general manager
$ 4,303.00
W. R. Jones
Vice President (Traffic)
1,916.00
C. G. Parsley
Vice President (Sales)
15,110.00
H. J. Jonnson
Vice President
1,790.00 The total amounts paid *305 to petitioner on the expense account reports he filed with HME during the years 1956 through 1959 are as follows: 1956
$11,508.88
1957
11,107.44
1958
12,973.90 The reports made by HME to the ICC list the "Expense allowance" of petitioner as $11,870, $13,662, $13,423.90, and $12,710 for the years 1956, 1957, 1958 and 1959, respectively. From time to time petitioner would entertain customers or prospective customers or other persons who had business connections with HME. In the report filed by HME with the ICC, expenses were required to be placed in very detailed categories. For example, there was an account designated, "Schedule 4000. - Operation and Maintenance Expenses" with a number of sub-accounts listed thereunder. There was an account designated "(4100) Equipment Maintenance" with various accounts of (4110), (4120), (4130), (4131), (4135), (4145), and (4160), for such items as supervision, office and other expenses, repairs and servicing - Revenue equipment, line haul equipment, pickup and delivery equipment, employees' welfare expenses, tires and tubes - Revenue equipment, and many other detailed categories. An account under the designation "(4200) Transportation Expense" had various *306 subdivisions such as "4220-1 Travel Expense, Transportation Department," "4220-2 Office Expenses, Transportation Department," "4231 Wages-Drivers and Helpers-Line Haul," and numerous other items. Under (4300) was the designation of "Terminal Expenses" and under that item such items as "4320-2 Office Expenses, Terminal," "4380 Other Terminal Expenses," "4380-1 Other Terminal Expense-Labor," and "4381 Light, Heat and Water Terminal." The designation for traffic and sales expenses was 4400 and various subdesignations were listed under this item such as "4450 Advertising," "4450-1 Sales," "4480-1 Other Traffic Expenses-Sales." The designation for administrative and general expenses was 4600 and this general designation likewise had numerous categories such as "4621 Expenses-General Officers," "4621-2 President," "4623 Other General Office Expenses," "4680-2 Donations-General," and "4680-3 Other General Expenses." Hembree was during all the years here in issue the chief accounting officer of HME and he was responsible generally for placing various items of expenditures in the proper category of the ICC accounting system on HME's books. HME's books were sometimes investigated by ICC auditors. *307 HME maintained at its Nashville terminal, as a part of its maintenance department, a repair shop for its equipment. The repair shop was under the general supervision of HME's superintendent of maintenance. As a part of the repair shop or maintenance department, HME maintained a parts department which would receive various parts ordered by HME for use in upkeep or repair of its equipment. For the purpose of filing the required report with the ICC, it was necessary for HME to keep separate accounts for the variously designated ICC categories. When any invoice came through the shop or maintenance department of HME, it would generally be O.K.'d by someone in the maintenance department and brought or sent to Hembree for posting in the right account and payment. To assist Hembree in his classification, not only would there be attached to an invoice the purchase order, but also there would be a classification made by someone in the maintenance shop to indicate the usage of the item so that its cost might be placed in the proper expense account. Sometime prior to 1956 when Hembree was checking invoices from the maintenance department he noticed the designation "S-shop" on certain of these *308 invoices. He inquired 243 in the parts department about this in order to ascertain the meaning of the designation, "S-shop" and from his investigation came to the conclusion that if the employee in the maintenance shop did not personally know whether the part covered by the invoice was actually received in the stockroom, or if the part was received in the stockroom and the man who was working in the parts department did not think the part was for the use of HME, the invoice would be marked with the notation, "S-shop." Hembree investigated some of the invoices marked with the designation "S-shop" since he considered it possible that some of the men working in the parts department might be retaining parts which were being paid for by HME and he wanted to verify whether or not this was a fact. From his investigation of the several invoices, Hembree found that the items covered by the invoices marked "S-shop" had actually been delivered to some of petitioner's other interests. He made no further investigation, and he did not discuss the matter with petitioner since he felt it would not be wise to do so. During the years here in issue the various individuals who worked in the parts department *309 of HME used the designation "S-shop" on invoices when they did not receive the part or material which was covered by the invoice or did not know what the part or material received was or for whose use it was. The designation "S-shop" on certain of HME's invoices began around late 1952 or early 1953. At that time Milford Clupper was HME's maintenance superintendent. Petitioner had a conversation with Clupper with respect to the use of the designation "S-shop" concerning items where an invoice went through the maintenance department which did not cover items relating to line haul equipment. It was Clupper's understanding that there had to be some method of reporting the expenses relating to line haul equipment separately from other expenses incurred in the shop. When respondent's agents were investigating petitioner's income tax returns, they examined certain records of Auto. They noticed that some invoices from some of Auto's suppliers carried penciled numbers on them and found that the penciled numbers were the numbers of the invoices for the same items billed by Auto to HME. The supplier's invoice would show that the material purchased had been delivered to petitioner's residence *310 or to John L. Burns Company, Inc. or to various places other than HME's places of business. The designation of the delivery of the materials would not appear on the invoice of Auto submitted to HME. However, by examining the invoices of Auto to HME contained in HME's files, respondent's agents found that the invoices covering items delivered by Auto's suppliers to someone other than HME in each instance bore a notation "S-shop." Respondent's agents questioned Hembree as to the meaning of the designation "S-shop." Hembree was hesitant to discuss the matter with respondent's agents and asked that he be allowed time to think over the questions. Subsequently, he informed respondent's agents that there were some irregular charges on the books of HME for expenses which were personal expenses of petitioner. Subsequently, respondent's agents were furnished a schedule by a representative of HME reflecting invoice date, invoice number, check date, check number, and invoice amount of "S-shop" items, the total amount of such items for the years 1956 through 1959 appearing on this schedule being $24,379.80. Respondent's agents were advised that the schedule had been prepared by employees of HME *311 who had some knowledge of "S-shop" items. After receiving this schedule respondent's agents ascertained that the items covered in the schedule were substantially the amounts covered by "S-shop" invoices from Auto and proceeded to make further investigation of "S-shop items." The amounts as finally determined by respondent to be includable in petitioner's income because of invoices paid on which the designation "S-shop" was put were $7,261.56 for the year 1956, $8,647.48 for the year 1957, $11,366.96 for the year 1958, and $22,983.65 for the year 1959. These amounts were parts of the items of miscellaneous income included in the notice of deficiency. Some of the items included by respondent in these schedules were items which were delivered to and used on petitioner's farm, and the parties are now in agreement that there was no deduction taken for these items in computing petitioner's income from the farm, and that, therefore, the amount of such items should not be included in petitioner's income. The amounts which the parties agree represent such so-called farm items which would be deductible had they been paid for by petitioner in the years 1956, 1957, 1958, and 1959 are $1,571.06, *312 $2,159.35, $1,987.06 and $2,652.26, respectively. 244 Respondent has also conceded that an item of $420.40 representing an oscillating fifth wheel which was purchased by HME for McMinnville is not includable in petitioner's income for the year 1959 since McMinnville issued a check to HME for this purchase. After reducing the total amount of "S-shop" items for 1956 by the amount which the parties agree should be eliminated as farm items, there remains an amount of $5,690.50 of so-called "S-shop" items for this year. Of the amount of $5,690.50, invoices totaling $1,012.63 relate to a piece of equipment listed as "D-7 cat" with a serial No. 3T 10344. Of the $5,690.50 total items amounting to $229.59 are identifiable as relating to items marked "Del. to Wills Garage," "Rec'd by John Wills," "Race car," or "R.C." so that the reasonable inference is that these items in some way relate to the racing activities. Items totaling $133.82 refer to airline tickets from Nashville, Tennessee to Akron, Ohio for "M. E. Parris", "M. Parris" and "Miss Parris" covering two trips. The remaining items all appear to be for mechanical or automotive parts or materials or machinery items. For the year 1957, *313 after removing the items relating to the farm in accordance with the agreement of the parties, there remains an amount of $6,488.13 relating to socalled "S-shop" items. The total items on the list for 1957 that by name would appear to relate to a farm or were signed for or picked up by an individual who was an employee at petitioner's farm are substantially in excess of the $2,159.35 which the parties have agreed were items used on petitioner's farm. Included among the items listed for 1957 are several purchases of dynamite and explosives totaling $341.03 which were picked up from the supplier by petitioner's farm employees. McMinnville's income tax returns contain deductions for dynamite and exploxives. The record shows that John L. Burns Company, Inc., which was formed on March 20, 1957, at the time it commenced operations kept its equipment at petitioner's farm and that Burns Equipment Company, Inc., from which John L. Burns Company, Inc., rented equipment in later years was not formed until March 24, 1958. The schedule for the year 1957 contains no items that from the invoice designation are shown to be for the personal use of petitioner or his family. There are three items, one *314 for $7.92, one for $21.02 and one for $53.86, the first of which refers to a "D-7 cat" and the latter two to parts for a "D-7 cat bulldozer." These items were picked up by farm employees. All the remaining items are items of mechanical equipment, automotive parts, tools, or hardware. The total amount of "S-shop" items shown on the schedule as finally prepared by respondent's agents for the year 1958 was $14,255.03. However, there was a notation that $3,610.08 of this amount related to the Hoover family farm, so the total on the list was reduced by $2,888.04 (fourfifths of $3,610.08), apparently to eliminate amounts chargeable to the co-owners of the Hoover farm, and respondent included "S-shop" items of $11,366.99 in the notice of deficiency as part of miscellaneous income. When the "S-shop" items, as determined by respondent in the notice of deficiency, are reduced by the amount of the farm items conceded by respondent, the remaining amount is $9,379.90. Included in this list are the following items for the personal use of petitioner: Bob's bicycle shop 1 tire and tube
$ 4.90
Bob's bicycle shop 1 tube 26x2.125
1.70
Bob's bicycle shop tune motor and repair
25.00
Spark plug - Mrs. Hoover's Lincoln
6.10
Part - Mrs. Hoover's Lincoln
1.50
Spark plug - Mrs. Hoover's Lincoln
6.10
U Joint - Mrs. Hoover's Lincoln
8.64
Water pump - Mrs. Hoover's Lincoln
22.95
Shock absorbers - Mrs. Hoover's Lincoln
12.06
$82.85
*315 There also appears under the designation "Check and make necessary repairs to * * * D-7 caterpillar tractor, S/N 3T 10344" an amount of $447.89 and under the designation "D-7 cat parts," the amount of $94.53. The invoices contained on this schedule include a number of invoices for materials such as sand, cement, and fir plywood. No items similar to these had appeared on previous lists of "S-shop" invoices. For the years 1959, the $22,983.65 which respondent included in the notice of deficiency as "S-shop" items as part of miscellaneous income in the amount of $66,285.06, was composed of the following items: Auto equipment and supply invoices
$14,477.01
Miscellaneous suppliers invoices and personal expenses of petitioner
5,570.77
Thompson & Green invoices
2,935.87 The parties have agreed that $2,652.26 of farm items and $420.40 representing an oscillating fifth wheel for which McMinnville reimbursed HME should be eliminated. The schedule prepared by respondent of the 245 "S-shop" items for 1959 had included $3,759.42 which represented $2,609.24 of payments for personal items for petitioner's use, such as payments to florists, payment of a hospital emergency bill for petitioner and his *316 wife, an amount of $707.29 to Martha White Quality Cleaners, and a payment of $442.89 to Auto for a record player and parts. These items have now been disposed of by agreement of the parties insofar as their inclusion in petitioner's income is concerned and are not part of the "S-shop" items for the year 1959 here in issue. The amount of $14,477.01 which was included in the $22,983.65 determined by respondent to be includable in petitioner's income as "S-shop" items was arrived at by allocating $13,744.97 of a total of invoices from Auto of $16,962.31 as being entirely income to petitioner, and allocating one-fifth of the remaining $3,660.25 represented by invoices from Auto on the theory that $3,660.25 of the items were used on the Hoover family farm. In addition to the record player item to which reference has heretofore been made, the amounts of invoices of Auto which were included by respondent in "S-shop" items include $297.42 representing items of a type which could only have been used personally by petitioner and his family. These items referred generally to such things as services and supplies furnished by Nashville Swimming Pool Company. There was an item in the amount of *317 $153.20 which showed by the invoice that it was purchased for McMinnville, and items which the invoices clearly indicated were for racing or race car activities of $1,132.99. Some of the "S-shop" items on this list are items which would appear from their designation to refer to property of McMinnville, one such item being 400 Wedges "Rockcrusher." The items included in the "S-shop" list did not include the 15,000 series of Auto invoices in the amount of $15,907.61 for 1958 and $1,830.72 for 1959, as previously stated, nor the $10,631.52 paid directly by HME for race car expenses in 1959, nor the items of $4,000 in each of the years 1957 and 1958 paid by HME to the Midwest Sprint Car account. The "S-shop" invoices also did not include $10,421.86 of items paid in various amounts, some small and some larger, by HME for improvements made to petitioners' personal residence, which items petitioner concedes to be includable in his income for the year 1959. The "S-shop" items do not include payments of $283.91 and $199.71 to Robert McIntyre Nursery for shrubbery and other nursery products used at petitioner's personal residence, which items petitioner now concedes to be includable in his income *318 for the years 1958 and 1959, respectively, nor does the amount of the "S-shop" items include a number of other personal items or advances made by HME to petitioner which the parties have now disposed of by agreement determining the extent to which such items are includable or are not includable in petitioner's income for the various years. There is no account on the books or records of HME carried as an account receivable in the names of McMinnville, John L. Burns Company, Inc., or Burns Equipment Company, Inc. The books of McMinnville show checks for three payments made by McMinnville to HME for equipment maintenance in 1956 totaling $68.72, checks for three such payments in 1957 totaling $340.15, checks for two such payments in 1958 totaling $340.15 and checks in addition to that for the fifth wheel in 1959 totaling $221.01. There is in addition an entry on McMinnville's books for November 1959 under the designation "Equipment maintenance" of an amount of $1,969.74. Of this amount $154.38 was paid in 1959 and is included in the $221.01 payment. The books of Kentucky Aggregate show two payments by check to HME in 1957 totaling $725.45. One of these for $242.08 is listed as being for *319 taxes, licenses, etc. and the other for equipment maintenance. The books and records of John L. Burns, Inc. show a check for $3 payable to HME in 1958 and eight checks payable to HME in 1959 totaling $974.12. McMinnville, John L. Burns Company, Inc., and Burns Equipment Company, Inc., all owned heavy equipment. Some of this equipment consisted of bulldozers and caterpillars of various sizes and designations. HME at one time owned a "D-7 caterpillar bulldozer" and at one time it owned a bulldozer of the D-4 type. Also, at one time John L. Burns Company, Inc., had its bulldozer on the HME lot, where it left it after it did some grading work for HME. HME owned a number of automobiles which it kept for the use of its employees including the two for petitioner's use, and it owned some pick-up type trucks. At times HME would have a trailer that belonged to another carrier which was being hauled on one of its tractors on a joint freight project which would need some repair while it was at the HME yard in Nashville, and the repair would be made in the 246 HME shop. In accordance with ordinary custom, if the cost of the repair were less than approximately $25 no charge would be made to the *320 other line for the repair, but repairs in excess of an amount of $25 would be charged to the carrier whose trailer was repaired in HME's shop. There was also a certain amount of repair work necessary on the shop's platforms and loading docks at HME's terminal in Nashville, which work was generally taken care of through the maintenance shop of HME. Although the individuals who made the mark of "S-shop" on items understood the description to relate to property not delivered to HME or parts which they considered not to be for use on HME equipment, certain items that were used in some capacity in the ordinary course of HME's business would inadvertently get an "S-shop" designation. When respondent's agents were going through invoices and were unable to recognize an item as properly a part of the operations of HME, the items was in many instances included in the "S-shop" items even though the invoice was not marked "S-shop." In some instances some of these items were such items as might have been used in terminal or platform repairs made by HME or on bulldozers or automobiles owned by HME. Most of the "S-shop" invoices had been charged to Account No. 4180 of the ICC accounting system. *321 This is the category for "Other Maintenance Expenses" under "Equipment Maintenance." However, there were many invoices included under several other categories of the ICC accounting system. Sometime in late 1956 or early 1957 petitioner was discussing with Hembree the fact that the laws of Tennessee and Kentucky limiting the length and weight of trucks were more stringent than laws in many other states. Petitioner advised Hembree that the trucking industry was attempting to secure legislation in Tennessee and Kentucky containing more favorable provisions to the trucking industry as to the length and weight of trucks to be driven on highways in those states. Petitioner told Hembree that in order to obtain the desired legislation, it was necessary for the trucking industry to make contributions to the campaigns of candidates who were friendly toward legislation more favorable to the trucking industry. Petitioner stated to Hembree that he had advanced some of his own funds to make political contributions to some candidates and that he considered it necessary to continue making such political contributions. Petitioner told Hembree that since the ICC system of accounting did not provide *322 for campaign contributions, some other means of securing funds to be used for campaign contributions should be found. Petitioner and Hembree decided that in order to obtain money and place the expenditure in an account which would not show noticeable distortion, Hembree would write checks payable to HME, cash them, and show the expense under the designation of "Expense for liquor." In accordance with this decision Hembree drew checks to HME, cashed these checks at the bank and gave the money to petitioner. Petitioner told Hembree that the cash he obtained in this manner was for political contributions. The total amounts of the checks drawn to HME's order and cashed with the expense entered under "Expense for liquor" and the cash received from the checks given to petitioner were $861.25, $3,859.90, $8,140.45, and $8,265.38 for the calendar years 1956, 1957, 1958, and 1959, respectively. Hembree, in carrying out his duties as chief accounting officer and secretary and treasurer of HME, did some traveling and incurred traveling expenses for which he was reimbursed by HME. He regularly submitted expense reports to HME. Sometime subsequent to the conversation between petitioner and Hembree *323 with respect to the obtaining of cash for political contributions as heretofore set forth, petitioner told Hembree that there was still some need for funds to be used for political contributions. Petitioner requested Hembree to submit to HME expense reports for amounts in excess of his actual expenses incurred on behalf of HME and when he received the checks in payment for these expense accounts to cash the checks and give the money in excess of the amount of his actual expenses to petitioner. Petitioner told Hembree that the funds he obtained from Hembree in this manner were to be used for political contributions. During the years 1957, 1958, and 1959, the total amounts given by Hembree to petitioner in cash from checks drawn to him covering expenses in excess of those actually incurred by him were $3,686.49, $5,099.39, and $5,998.45, respectively. In the year 1957, J. A. Barton, who was at that time the manager of the Middle 247 Tennessee District of HME made a $3,000 political contribution to certain Tennessee legislators whom he believed might be friendly toward passage of legislation beneficial to HME. Because of the size of the contribution involved, he wanted some acknowledgment *324 of the receipt of the money to show to petitioner from whom he had received the $3,000 in cash. He was given a receipt for the $3,000 which referred to the $3,000 as received as an "attorney fee." In Tennessee, legislators to the State legislature are elected in the even years and the legislature meets in the odd years. In addition to the $3,000, Barton received between $2,500 and $3,500 from petitioner in cash in 1957 to be used as political contributions and received in each of the years 1958 and 1959 approximately $2,500 to $3,500 in cash from petitioner to use for political purposes. One of the three members of the commission of the State of Tennessee which regulates motor carrier trucks runs for election every two years and each of the three has a six-year term. When any of these commissioners was running for reelection, the Director of Motor Carrier Trucks would solicit campaign contributions to help support the commissioner's campaign. On some occasions donations to the campaigns of these commissioners would be made without solicitation. Some individual would call and state that he would like to make a contribution and the Director of Motor Carrier Trucks would go and pick up *325 the contribution. Each time one of the commissioners was running for reelection, petitioner would make a contribution of from $500 to $700 to that Commissioner's campaign. It was the understanding of the Director of Motor Vehicles when he would receive a campaign contribution from petitioner that the amount was a contribution from HME. No commissioner ran for reelection in 1958 since the commissioners are elected in odd years. In each of the years 1957 and 1959 one of the commissioners was running for office. Petitioner, personally, made contributions on behalf of HME to certain political campaigns in the States of Tennessee and Kentucky for legislators, and in 1958 and 1959, made some contributions to the political campaign of one of the candidates for Governor of Kentucky. In the year 1958 petitioner made such contributions of approximately $5,000 and in the year 1959 of approximately $10,000. Petitioner and Hembree consulted almost daily with respect to the financial matters of HME. In the early part of 1957 petitioner had a conversation with Hembree in which he stated to Hembree that he was going to form Tidewater mainly for the purpose of investment and doing public relations *326 work, with the possibility of Tidewater's participating in political activities. Petitioner discussed with Hembree the financing of Tidewater and gave Hembree a list of names of firms to be billed certain amounts on a monthly basis in the name of Tidewater in order to accumulate funds for Tidewater. One of the firms to be billed monthly amounts was Auto. Auto in the year 1958 was billed on invoices of Tidewater in the total amount of $400. This $400 was paid by Auto to Tidewater and Auto obtained the amount from HME by submitting fictitious invoices to HME covering the same amount. No services of any kind were rendered by Tidewater for Auto. During the year 1957 in a meeting between representatives of HME and Ingram Oil and Refining Company (hereinafter referred to as Ingram), the sale of oil by Ingram to HME was discussed. Ingram was desirous of supplying HME with gasoline and diesel fuels at Nashville and Knoxville, Tennessee, Sheffield, Alabama (and possibly Birmingham, Alabama) and Atlanta, Georgia. During the course of the meeting, someone on behalf of HME inquired of a representative of Ingram whether it would be possible for Ingram to add one cent per gallon to the prices for *327 gasoline and diesel fuel for which it billed HME and pay this "brokers' fee" or "commission" to a company by the name of "Tidewater". After some discussion and intercompany memoranda between various officers or employees of Ingram, it was concluded that Ingram would bill HME for one cent per gallon more for gasoline and diesel fuel than the actual price they had agreed to charge HME for such fuel and pay the extra one cent per gallon to Tidewater. In accordance with this agreement, Ingram did bill the extra one cent to HME from approximately the end of May 1957 until HME discontinued purchases from Ingram, and Ingram did pay the one cent directly to Tidewater. The total amounts paid by Ingram to Tidewater were $8,957.51 and $4,518.10 in 1957 and 1958, respectively. Tidewater never rendered any service of any type for Ingram. Beginning sometime around 1947, Bransford, Sharp & Co., an insurance agency 248 doing business in Nashville, Tennessee, had handled a considerable volume of business for HME. Early in 1957 petitioner told Dudley Bransford, the president of Bransford, Sharp & Co., that he had organized an advertising and sales promotion agency known as Tidewater and that Tidewater *328 would be in a position to help Bransford obtain insurance with other truck carriers. He suggested that Bransford pay a monthly fee of $400 to Tidewater for such services. Since HME was a substantial customer of his insurance agency, Dudley Bransford agreed to make the payments, and petitioner gave him a post office box number as the mailing address of Tidewater. During the year 1957 Bransford, Sharp & Co. made ten $400 payments to Tidewater, thereby paying a total amount of $4,000, and two such payments, or a total of $800, were made by Bransford, Sharp & Co. to Tidewater in 1958. After some time had passed from the time Bransford agreed to make the payments to Tidewater and nothing had been done by Tidewater to assist in promoting Bransford's business, Bransford wrote to Hembree and asked that someone from Tidewater call on Bransford, Sharp & Co. No one associated with Tidewater called on Bransford, but Bransford did receive letters purportedly from Tidewater signed by M. L. Parris, Secretary, listing numberous business transactions that had taken place in the Nashville area. There was no indication in the letters, however, that anything was being done by Tidewater to further the *329 interests of Bransford, Sharp & Co. Sometime in early 1958 the question arose at a board of directors' meeting of Bransford, Sharp & Co. as to what services were being received for the $400 payments. The attorney for this company insisted on investigating what Tidewater was doing for the insurance agency and called the attorney for HME. After this call the attorney for Bransford, Sharp & Co. advised the board of that company that payments to Tidewater should be stopped immediately. Sometime in September 1957, petitioner directed Turner, the pilot for HME, to prepare a newsletter on letterhead stationery of Tidewater and to sign the newsletter "M. L. Parris." The newsletter was to be addressed to Bransford, Sharp & Co. Turner looked at the local newspapers and found certain business transactions which had occurred and drafted a letter dated September 13, 1957, addressed to Bransford, Sharp & Co. at its address in Nashville. This letter read as follows: TIDEWATER ASSOCIATES, INC., P.O. Box 7114 Nashville, Tenn.
September 13, 1957 Bransford, Sharpe & Company
421 Union Street Nashville, Tennessee Gentlemen: We would like to take this opportunity to outline to you our plans for the immediate *330 future to assist you in securing leads and other pertinent information that may be of extreme value to your company in securing additional insurance business. We are sure that you are aware that the State Government has various insurance policies that expire on an almost day to day basis. It is our intentions to make the right contacts with these people in order to help secure some of this type business which in turn would be to your benefit. We are aware that your firm insures a large number of trucking companies in the South and Southeast territory and we would like to bring to your attention some of the recent purchases and transactions that have taken place in your district. As you may or may not know, the Wilson Trucking Company has purchased Simpson Trucking Company in the States of Georgia, North Carolina and South Carolina. Arnold Ligon has negotiated for the Durrett Transfer Company which operates between Nashville, Tennessee and Evansville, Indiana. There is a rumor that Hoover Motor Express has expanded into the Chicago area. We mention the foregoing transactions in hopes that it will be of some value to your firm in contacting and soliciting business from these firms. It *331 is our intentions, that in the future, we will endeavor to stay abreast of all these type transactions and will take the liberty of calling them to your attention. Kindest regards, Sincerely yours, s/M. L. Parris Secretary Turner signed the name "M. L. Parris" to this letter. Other similar newsletters were drafted by Turner and signed by him with the name "M. L. Parris." Cook printing Company made certain sales to HME in 1957 and someone from HME told James F. Cook of that company that HME was having to raise some money to make political contributions and was calling on its customers to help it raise the 249 money. The payments were to be made to Tidewater based on the amount of sales to HME. Cook Printing Company made two payments to Tidewater in 1957, the two payments totaling $59.10. No one connected with Cook Printing Company knew anything about Tidewater. Tidewater performed no services for Cook Printing Company. Prince Electric Company made payments totaling $400 to Tidewater in 1957 and obtained reimbursement of the $400 from HME on fictitious invoices. An employee of Prince Electric Company would bring invoices to Hembree which were blank except for the name of HME being *332 written at the top of the invoice. Hembree would fill out the invoice for fictitious parts and services and initial the invoice "OK WCH" and submit it for payment. In this manner Prince Electric Company recovered from HME the payments made to Tidewater. Inglewood Auto Electric made payments to Tidewater of $600 in 1957 and likewise obtained the amounts of these payments from HME on fictitious invoices for material which was not in fact delivered to HME. HME paid directly to Tidewater in the year 1957 on invoices for which no services were rendered to HME a total amount of $2,700. The Federal income tax return of Tidewater for the year 1957 was signed in the name of "M. L. Parris, Secretary-Treasurer." Hembree signed the return in this fashion at the direction of petitioner. This return reported certain income which included the $17,116.61 received from Bransford, Sharp & Co., Ingram, Prince Electric Company, Cook Printing Company, Auto, Inglewood Electric, and HME. Salaries of $8,869.35 were claimed as a deduction on this return filed in the name of Tidewater. A Federal income tax return in the name of M. L. Parris, giving under home address "Box 7114," the Post Office Box number *333 of Tidewater, showing wages in the amount of $8,869 as received from "Tidewater Associates, Inc., Nashville, Tennessee," was filed for the year 1957. William Thomas Harper, to whom M. L. Parris was married in 1957, filed an income tax return for that year, itemizing his deductions and claiming three dependency exemptions one of which was for M. E. Parris, who was M. L. Parris' mother. On this return he checked the box that his wife, Mary Lou Parris (Harper), was filing a separate return. On the return filed in the name of M. L. Parris, the standard deduction was taken. After his divorce in 1958, petitioner married M. L. Parris. The only disbursements made by Tidewater during the years 1957 and 1958 were to M. L. Parris, Colorado-Southern, and the Internal Revenue Service. Payments in the total amount of $10,421.86 were made directly by HME in 1959 for improvements on petitioner's personal residence. During the year 1958 HME paid directly to Vanderbilt University Hospital the sum of $767.47 for medical expenses of petitioner's mother-in-law, M. E. Parris, and during the year 1959 HME paid directly to Vanderbilt University Hospital and Massey Surgical Supply for services and medical *334 supplies for petitioner's mother-in-law, M. E. Parris, the total sum of $630.15. The bills on which these payments were made were brought to Hembree for payment by the Director of Personnel of HME. Hembree listed the expenses covered by these payments under charges to Workmen's Compensation on the books of HME. On the personal account receivable for petitioner maintained on the books of HME there was shown at the beginning of 1956 a balance due from petitioner in the amount of $4,847.93 which had been carried forward from the year 1955. The balance due from petitioner in this account was transferred to a new account entitled "Other investments and advances - E. H. Hoover, Jr." by an entry dated July 31, 1957. The balance of $4,847.93 which had been carried forward from the year 1955 was credited by journal entries during the year 1958 which reduced the balance in the new account to zero at the end of the year 1958. The new account was charged by journal entry dated September 30, 1959 in the amount of $500 which was a transfer from the notes receivable account of petitioner on the books of HME. The only other charge to this account was the charge for groceries as of December 31, 1959, *335 in the amount of $1,636.44 as hereinbefore discussed. It was this account that Hembree showed to petitioner at least once a year and sometimes at other intervals. On many of the flight reports kept by Turner of the flights of HME's plane during 1958 and 1959, Hendrixson and Burns and other employees of McMinnville and John L. Burns Company, Inc. are listed as passengers. On a number of trips 250 various members of petitioner's family are listed as passengers. On November 27, 1959 there is a trip from Nashville to Knoxville and return to Nashville listed as "football trip 5 passengers" with Turner as pilot. The following shows the earned surplus and undivided profits of HME as reflected on its Federal income tax returns for the years indicated: Year ended December 31
Amount
1956
$1,522,318.60
1957
1,512,699.36
1958
934,288.34
1959
1,281,701.00
Petitioners on their Federal income tax returns for the calendar years 1956 through 1959 reported the following amounts of taxable income: Year
Amount
1956
$51,427.19
1957
31,762.67
1958
47,158.18
1959
58,649.73 Included in the income as reported were the amounts of $1,200.00, $2,860.00 and $3,000.00 for the years 1957, 1958 and 1959, respectively, of "Miscellaneous *336 income." All other reported income was from specifically shown sources. The returns for the years 1957 and 1958 contained the words "trades etc." following the designation "Miscellaneous income." For the year 1959 the reference was merely to miscellaneous "transactions." In the income as so reported no amount was included as amounts paid by HME or other companies on invoices billed to HME by Tidewater. No amount was included as payments made to the Midwest Sprint Car account or on fictitious invoices of Auto. No amount was included because of groceries paid for by Auto and billed to HME, for the $5,000 for which Auto billed HME on fictitious invoices on which no deliveries were made, for the improvements to petitioner's residence paid for by HME, for the hospital and medical bills paid for M. E. Parris by HME, for the payments made by HME to the Robert McIntyre Nursery for shrubbery for petitioner's home, for gain on the disposition of the Knoxville Terminal, for salaries or expense account amounts paid under these categories by HME to Fred Capshew, for any of the items shown on the invoices to HME which were designated with the notation "S-shop," for the moneys received by petitioner *337 from checks of HME cashed and charged to expense for liquor, or for the cash received by petitioner from Hembree which he obtained from HME from fictitious additions to his travel expense account. None of these returns showed any amount received by petitioner as reimbursed expenses. Likewise, these returns did not include certain other items which the parties have agreed to be taxable income to petitioner in the years here in issue, but the omission of which from petitioner's income, respondent is not contending constituted fraud. Petitioner's income tax returns for each of the years here in issue were prepared by an accountant from information furnished to that accountant by petitioner. When the preparation of the return was completed the accountant asked petitioner whether there was any other income which should be included on the return which the accountant did not know about. Petitioner's income tax return for the calendar year 1956 was filed on April 15, 1957. Respondent's notice of deficiency for the year 1956 was mailed to petitioners Eph H. Hoover, Jr., and Johnnie B. Shannon (former wife of Eph H. Hoover, Jr.) on November 2, 1966. Ultimate Facts Respondent has failed to show *338 that the income tax return filed by petitioner for the year 1956 was false and fraudulent with intent to evade tax and, therefore, any assessment or collection of tax for the year 1956 is barred by the statute of limitations. Petitioner realized income with respect to the various moneys furnished by HME to Auto in connection with the racing activities of petitioner in the amount of $4,000 in the year 1957, $19,907.61 in the year 1958, and $4,462.24 in the year 1959, in addition to the $5,000 in the year 1959 with respect to fictitious invoices to HME from Auto for batteries and pressure plates. The fair market value of the Knoxville Terminal at the date it was transferred to Johnnie Billingsley Hoover (now Johnnie Billingsley Shannon) on February 20, 1958, was the cost of that terminal of $97,489.65. The amount paid to HME for the terminal was $40,000 since the note was in effect merely a reduction in the rent of the terminal. The difference in the fair market value of the Knoxville terminal and the payment for this terminal of $57,489.65 constituted income to petitioner in the year 1958. Petitioner received income because of salary and expense money paid by HME to 251 Fred Capshew *339 for personal expenses paid by Capshew for petitioner and personal services done by Capshew for petitioner which would not have constituted deductible expenses by petitioner had petitioner paid for these services in the amounts of $600 and $3,000 for the years 1958 and 1959, respectively. The total amounts received by petitioner as payments of his "expense accounts" in the years 1957, 1958, and 1959, are includable in his income and petitioner is entitled to deduct $2,500 of such amount in each of these years as ordinary and necessary business expense. Petitioner received taxable income through material received by petitioner or some other business interest of petitioner's which was billed to HME on invoices designated "S-shop", exclusive of invoices of Auto for race car funds and payments to Tidewater in the total amounts of $3,000, $5,000, and $10,000 for the years 1957, 1958, and 1959, respectively. Of the amounts of cash given by Hembree to petitioner in the years 1957, 1958, and 1959, from checks to cash charged to liquor purchases and from Hembree's expense account, a total amount of $6,000 in 1957, $7,500 in 1958, and $13,000 in 1959 was disbursed as political contributions on *340 behalf of HME, leaving as income to petitioner from those sources the amounts of $1,546.39 in 1957, $5,747.84 in 1958, and $1,263.83 in 1959. A part of the underpayment of tax by petitioner in each of the years 1957, 1958, and 1959 was due to fraud with intent to evade tax. Opinion Since petitioner's income tax return for the year 1956 was filed on April 15, 1957, the ordinary statute of limitations for determining a deficiency expired on April 15, 1960. Respondent's notice of deficiency for 1956 was not mailed to petitioner until November 2, 1966. Therefore, assessment or collection of any deficiency for the year 1956 is barred by the statute of limitations unless the provision of section 6501(c)(1), that in the case of a false or fraudulent return with intent to evade tax, the tax may be assessed at any time, is applicable. The burden of showing an exception to the statute of limitations is on respondent. Where, as here, respondent alleges that the ordinary statute is inapplicable because of the filing of a false or fraudulent return with intent to evade tax, the burden is upon him to show such fraudulent intent by clear and convincing evidence. Respondent contends that petitioner's *341 failure to include in the income reported on his 1956 return the $11,508.88 which he received as payment of his "expense accounts," the $861.25 cash which he received from "fictitious liquor purchases," and the $5,690.50 representing amounts paid by HME on invoices marked "S-shop" was due to fraud with intent to evade tax. Petitioner did not include in income on his tax return for the year 1956 the $11,508.88 which he received as payments of the "expense accounts" he submitted to HME. The law is settled that petitioner should have included this amount in his reported income. Even if the payment could have been considered as "reimbursed expenses," the law and regulations applicable to the year 1956 require that the total amount be included in income. Section 19.23(a)-2(b) and (c), Regs. 103, specifically provided for the inclusion in gross income of reimbursements for traveling expenses, including meals and lodging or per diem in lieu of such expenses. Section 1.62-1(e) and (f), Income Tax Regs., applicable to the 1954 Code, which were promulgated November 22, 1957, by T.D. 6272, 22 Fed. Reg. 9419, 1957-2 C.B. 18, 35, specifically referred to the inclusion of all reimbursed expenses *342 in gross income and the deduction of certain reimbursed expenses in computing adjusted gross income. The first year for which a taxpayer was not required to include in income all reimbursement by his employer for expenses was the calendar year 1958. T.D. 6306, approved August 22, 1958, 23 Fed. Reg. 6665, 1958-2 C.B. 64, applicable to taxable years beginning after December 31, 1957, amended respondent's regulations by adding section 1.162-17(b) and (c) providing that certain reimbursed expenses for which an employee was required to account to his employer need not be included in the employee's gross income as reported on his income tax return. This regulation defined in general terms the meaning of "account" to his employer. It provided for the inclusion in a taxpayer's income of any reimbursement in excess of the expenses incurred by the employee for the benefit of his employer and for the inclusion of all reimbursements for which the employee was not required to or did not account to his employer and the substantiation of the business expense deductions claimed. Under the law and regulations applicable to the year 1956 it was gross negligence on 252 the part of petitioner not *343 to include the $11,508.88 he received from HME as payments of his "expense accounts" in his reported income. However, if petitioner actually expended this amount for travel, entertainment, or other purposes solely for the benefit of HME, he has evaded no tax by not including the amount in income since he would be entitled to a deduction in an equal amount. It is incumbent on respondent, in order to establish fraud on the part of petitioner for failing to include the $11,508.88 in income, to show that this amount was not expended by petitioner solely for the benefit of HME. For the year 1956, respondent has not made such a showing. Respondent produced no evidence for the year 1956 indicating that petitioner was on vacation and could not have spent the amount paid to him by HME on "expense accounts" for travel or other expenditures on behalf of HME. For the year 1957 respondent introduced some evidence of days when petitioner claimed expense reimbursements for amounts which had been charged directly to HME. For the years 1958 and 1959, respondent introduced a number of bills for petitioner's room, lodging, and other expenses which were paid directly by HME for the same period for which *344 petitioner claimed travel reimbursements for hotel bills and meals. However, there is not one such duplication of payment shown by respondent for the year 1956. For the year 1956 petitioner was not required to show that he did expend the amount paid to him by HME pursuant to his "expense accounts" for the benefit of HME until respondent had at least shown that some portion of the amount was not so spent, thus making some showing of fraud in the omission of the amount from income. Because of the evidence with respect to later years showing so clearly that for many of the weeks in which petitioner received purported "reimbursed expenses," his expenses had been fully paid directly by HME, or he was on a vacation with his family or actually charging his meals to HME at a restaurant in Nashville, or having his expenses for food and lodging paid by Turner, a suspicion immediately arises that the same was quite likely true during the year 1956. However, it has long been settled that suspicion of fraudulent omission from income is not a substitute for the clear and convincing evidence which respondent must produce to establish fraud. Walter M. Ferguson, Jr., 14 T.C. 846 (1950). The next item *345 on which respondent relies for fraud in 1956 is the $5,690.50 included in petitioner's income by respondent as the total of invoices marked "S-shop" during that year less the invoices relating to farm items, the payment of which by HME respondent and petitioner have agreed did not result in income to petitioner. The only invoices for the year 1956 which are sufficiently identified to establish that the items listed thereon were not used by HME for its own benefit are invoices amounting to $229.59 which can be identified as relating to petitioner's race car activities because of notations on the invoices such as "Del. to Wills Garage," "rec'd by John Wills," "Race car," or "R.C.," and invoices totaling $133.82 for airline tickets from Nashville, Tennessee to Akron, Ohio for travel by M.E. Parris. Petitioner has not proved that the balance of the items included on the "S-shop" invoices was not in fact for his personal use. However, as stated with respect to the "expense accounts" payments, since assessment of a deficiency for the year 1956 is barred by the statute of limitations absent a showing that petitioner's return was false and fraudulent with intent to evade tax, it is not necessary *346 for petitioner to show that the amount paid for these items did not constitute income to him. It is incumbent on respondent to show that the items covered by the "S-shop" invoices were for petitioner's personal use and did constitute income to him which he deliberately and knowingly did not report. Respondent has shown that HME paid personal expenses of petitioner of slightly over $363 in 1956. This amount is very small when compared to the total amount of petitioner's reported income. Petitioner had income from a number of sources and might well have overlooked the fact that his account at HME was not charged with the small payments for his benefit. While petitioner's failure to report this $363 of income or have the payments charged against his personal account on the records of HME causes us to suspect that he may have deliberately understated his income, we do not consider the omission of this small amount to be clear and convincing evidence of fraud. The $861.25 of "fictitious liquor purchases" was cash petitioner obtained from Hembree to use for political contributions for the benefit of HME. Not only has respondent 253 failed to show that this amount was not used for political *347 contributions on behalf of HME in 1956, but there is evidence in the record tending to show that it well might have been so used. We do not consider the evidence of petitioner's omissions from income for the year 1956 to be sufficient to establish fraud with intent to evade tax. We have therefore concluded that respondent has failed to establish by clear and convincing evidence that petitioner's income tax return for the year 1956 is false and fraudulent with intent to evade tax. It follows that the assessment or collection of any income tax deficiency for the year 1956 is barred by the statute of limitations. Therefore, we will not discuss further any items with respect to the year 1956, except insofar as the item may relate in some manner to a proper determination of the issues for subsequent years. The next issue concerns payments made in 1957, 1958, and 1959 by HME, or by Auto with funds received from HME, for the purpose of buying, maintaining, and operating race cars. Except for $2,221.06 representing items on certain invoices from Auto to HME which we have concluded from the evidence were for parts or services furnished by Auto to HME, the record shows that the amounts as determined *348 by respondent were paid by HME in connection with racing activities. In each of the years 1957 and 1958, HME paid directly to a bank account under the name, "Midwest Sprint Car," the amount of $4,000. The evidence shows that the Midwest Sprint Car account was an account maintained for Wills to use in connection with the race car activities in which he and petitioner were both interested. The evidence is equally clear that in 1958 and 1959 Auto obtained from HME by presenting to HME for payment false invoices, most of them in the 15,000 series of invoices which petitioner gave to employees of Auto to use for the purpose of obtaining funds from HME where no goods or services were furnished by Auto to HME, the total amounts of $15,907.61 and $1,830.72, respectively. Likewise, the evidence is clear that in 1959 HME paid directly expenses with respect to the race car, the title to which during that year was transferred from Wills' name to Auto's name and then to Tidewater's name, the amount of $10,631.52. Petitioner does not deny that HME paid the amounts which we have set forth above in connection with race car activities in which petitioner was interested, or that a high percentage of *349 the funds so paid was obtained by false invoices submitted by Auto to HME. Petitioner contends that the race car activities constituted advertising for HME and therefore the payments were proper deductions by HME as an advertising expense. Petitioner argues that since the payments were not for his personal benefit, the amounts of these payments did not constitute income to him. The record shows that in the year 1959 HME did receive some publicity from the fact that the race car which was entered by petitioner and Wills in the Indianapolis race in both 1958 and 1959 came out in fourth place in 1959. This race car bearing the name and colors of HME was displayed in a department store window in Nashville. Also, certain newspaper publicity resulted to HME from its name appearing on the race car. The record is not clear that any benefit was received by HME from the race car bearing its name and colors being entered in the 1958 Indianapolis 500. However, the record does show that HME on its own income tax return for the year 1958 deducted $4.146.19 explained as "Race car signs, etc." The inference from this deduction would be that this amount of expenses was paid directly by HME in connection *350 with the race car for advertising purposes, and there is nothing in the record to show that this amount is any duplication of the amounts of $4,000 and $15,907.61 paid to the Midwest Sprint Car account and to Auto on the false invoices. For 1959, after July 1, the direct payments by HME to Tidewater of $500 a month in connection with the race car operations were by an agreement between Tidewater and HME. The evidence shows that it was not uncommon for the sponsor of a car at the Indianapolis 500 to pay amounts ranging from $10,000 to $20,000 for such sponsorship and that in 1961 after Ryder took over the management of HME, Tidewater obtained an unrelated sponsor of its race car for the 1962 Indianapolis 500, which paid Tidewater $8,750 for such sponsorship Another clear inference from the record is that $12,000 of the amount paid by HME either to the Midwest Sprint Car account or on the false invoices of Auto was used for the purchase price of the race car which was run in the Indianapolis 500 in 1958 and 1959. Petitioner has come forward with no explanation as to how this $12,000 could be a proper deduction for HME. Although 254 the race car was originally registered in the name *351 of Wills, the evidence shows that it was owned jointly by Wills and petitioner. Wills' contribution appears to have consisted primarily of his expertise in managing and handling the race car, and petitioner's contribution of the money to buy and operate it. When the dispute arose between petitioner and Wills, petitioner was the one who obtained the race car. Wills received a payment of $4,000 and apparently a cancellation of any amounts he owed to Auto for not only his interest in the race car but also his interest in Auto. He had originally put $1,000 into Auto and the record does not clearly show to what extent he had other interests in Auto. That the racing activity was primarily a personal interest of petitioner and his hobby is equally clear from the record. Petitioner and Wills had been associated for many years in race car activities and up until the purchase of the car to enter in the Indianapolis 500 in late 1957 or early 1958 had raced sprint cars. The very system which petitioner used to get money from HME to Auto for race car operations is a clear indication that to an appreciable extent he did not consider the race car activities to be a legitimate expense of HME. HME *352 was allowed to deduct advertising expenses under the ICC accounting forms and, of course, advertising may constitute a deductible business expense for income tax purposes. If the race car expenses had been for advertising for HME, there was no reason for HME not to make direct payments to Wills or petitioner for use of the race car and deduct the payments. However, to the extent that HME did receive an advertising benefit from the race car for payments made directly to the race car owner and so entered on HME's books, we conclude that the amount represented a legitimate expense for HME in spite of petitioner's personal interest in racing. Since the car had not won any awards in 1958 but was a new entry in the race in that year, we consider that the $4,146.19 that HME deducted on its own return as expenses in connection with the race car was sufficient payment for any advertising benefit it received in that year. Also, this $4,146.19 was the only amount not procured in 1958 by devious means. Therefore, we have concluded that there should be included in petitioner's income in 1958 the amount of $19,907.61 consisting of the $4,000 paid to the Midwest Sprint Car account by HME in 1958 *353 and the $15,907.61 paid by HME to Auto by payments on fictitious invoices. Since the race car won fourth place in the Indianapolis 500 in 1959, the payment for the advertising benefit of its sponsorship by HME was greater in 1959 than in 1958. We have concluded that $8,000 of the direct payment by HME for upkeep and expenses of the race car was a legitimate advertising expense and have included $2,631.52 of the direct payments and the $1,830.72 received through payments of fictitious invoices from Auto to HME in petitioner's income for 1959. There is no showing that there was any advantage to HME from the Sprint car racing and we have therefore concluded that respondent was correct in including the whole $4,000 paid by HME to the Midwest Sprint Car account in 1957 in petitioner's income. The issue here is somewhat similar to that involved in American Properties, Inc., 28 T.C. 1100 (1957), affirmed 262 F. 2d 150 (C.A. 9, 1958), except that no concealment was made of the payments by that corporate taxpayer for the construction and operation of the boats raced by its stockholder-officer. In American Properties, Inc., supra, the corporate directors had decided at a meeting that the corporation *354 would finance the construction and operation of the race boats. However, after considering the evidence, we concluded that the boat racing activities were in fact a hobby of the stockholder-officer and held that the expenses in connection therewith were not deductible by the corporation and that the amounts of such payments were income to the stockholder-officer taxpayer. The facts in the instant case likewise show that the payments by HME, except to the limited extent heretofore set forth, were for the personal benefit of petitioner and were income to him. In the instant case there was no action taken by the directors of HME providing that HME would pay for or support the petitioner's race car activities and most of the funds for this activity of petitioner were obtained from HME by submission of false invoices to HME so that the expense might be deducted by HME under other accounts. Petitioner takes the position that the sale to Johnnie and the trusts of the Knoxville terminal was a completely different transaction from the property settlement which he made with Johnnie at the time of 255 divorce. The property settlement is not in evidence. Petitioner testified to the effect that *355 the settlement included, among other provisions, his agreement to pay Johnnie $40,000 in cash. He testified that after this agreement had been made Johnnie asked him to help her invest the money and he suggested the purchase of the Knoxville terminal. We have Johnnie's testimony, by deposition, to the conclusion that the acquisition of the Knoxville terminal was a separate agreement from her property settlement agreement. She testified that the property settlement agreement was arrived at in November 1957, that thereafter she asked petitioner what to do with her money, and he then suggested that she purchase the Knoxville terminal. On cross-examination she refused to disclose the nature of the property settlement agreement she said was arrived at in November 1957. [6] *356 *357 We have the testimony of Judge Trimble, who heard the divorce case and signed the divorce decree. In his testimony he referred to the notes he had taken at the time of the hearing with respect to the divorce to refresh his memory. He testified that the property settlement included the sale to Johnnie and the trusts for petitioner's children of the Knoxville terminal and that under this property settlement the $40,000 cash which was to be paid to HME for the terminal was to be paid by petitioner. In addition to this we have the evidence that petitioner paid the $40,000 to HME by his check. We have weighed the evidence before us and have concluded that petitioner arranged for the purchase of the Knoxville terminal from HME for his former wife and minor children as a part of the property settlement agreement between him and Johnnie referred to in the decree granting Johnnie a divorce from him. Petitioner's argument with respect to the Knoxville terminal transaction is pretty well summarized in the following statement in his brief: The Judge of *358 the Court granting the divorce testified from notes that he was told that the former Mrs. Hoover was receiving this property, but this is not in any way evidence contrary to that given by Mr. Hoover and his former wife. The notes which the Judge of the Court granting the divorce referred to were those taken of the representations made to him at the divorce proceeding which representations he relied on in entering the divorce decree without incorporating therein the details of the property settlement. This Judge testified that generally either the terms of the property settlement would be incorporated into the divorce decree or a copy of the agreement attached to the decree. Johnnie was in the courtroom and heard her lawyer make the representation that the sale of the Knoxville terminal to her was a part of the property settlement agreement. She did not correct this representation. Under these facts we do not accept as fact her conclusory testimony that this transaction was not a part of the property settlement agreement. Petitioner's testimony was a self-serving conclusion which we likewise do not accept. No copy of the written agreement between petitioner and Johnnie, if any, was *359 produced, and the lawyers who worked 256 out the agreement were not called as witnesses. The credible evidence in this record is that the sale to Johnnie and the trusts for petitioner's children of the Knoxville terminal was a part of the property settlement agreement between petitioner and Johnnie incident to their divorce. Petitioner further argues that even if the Knoxville terminal was transferred to Johnnie as a part of the property settlement referred to in the divorce decree, respondent's valuation of the Knoxville terminal is too high. Respondent's valuation of this property was based entirely on a capitalization of the rental payments or earnings of the Knoxville terminal at 12 percent to arrive at a minimum value of that property of $150,000. Respondent directs our attention to the case of Robert J. Dial, 24 T.C. 117, 126 (1955), in which we considered the net rental income of the property capitalized at 9 percent to be indicative of its fair market value, in support of his calculation of the value of the Knoxville terminal. We are aware of the fact that in many cases a capitalization of rentals at some reasonable percentage has been considered in determining the fair market *360 value of real property. However, in the instant case there exists much doubt as to the reasonableness of the rental payment because of the control petitioner was exercising over HME. Under all the circumstances here, we have concluded that the actual cost of the Knoxville terminal is the best evidence available of its fair market value. The Knoxville terminal was transferred to Johnnie soon after its completion and its fair market value should be close to its cost. Petitioner argues that certain of the leasehold improvements which were part of the Knoxville terminal were retained by HME. The facts do not bear out petitioner's argument. On HME's journal entry there appears a debit of $31,004.50 under the designation "Acct. No. 1270 - Improvements to leasehold property." However, this is clearly a balancing figure placed on HME's books since there had to be some debit to offset the credits for the cost of the terminal which costs consisted of $21,235.57 of land and land rights and $76,254.08 cost of structure. The deed to Johnnie and the trusts for petitioner's and Johnnie's minor children makes it clear that the land together with all improvements thereon without any reservation is *361 being deeded. The provisions of the lease back to HME of the Knoxville terminal also show that all leasehold improvements are the property of the lessors. Having determined that the fair market value of the Knoxville terminal was its cost of $97,489.65, it is necessary to determine what was paid to HME for the Knoxville terminal. Petitioner issued a check to HME for $40,000, which was credited to the purchase of the Knoxville terminal, and this amount is not in dispute. In addition, the deed recited that a part of the consideration was $25,000 for which the grantees had executed a promissory note without interest, payable in equal monthly installments of $138.88 for 180 consecutive months, beginning April 1, 1958, and that a lien is expressly retained to secure payment of the note. However, in the lease agreement which provided that HME lease the terminal from Johnnie and the trustees for petitioner's and Johnnie's minor children for 30 years, the note was also referred to with the statement that, "It is expressly understood and agreed that the lessee may and is hereby authorized to credit each monthly rent installment of $1,500 with the monthly payment of $138.88 due from lessors *362 to lessee and to pay only the remainder of each rent installment to lessors in full satisfaction thereof." The lease further required that the lessee would make all repairs and improvements necessary on the property, would pay all taxes and insurance, or, in effect, that the lessee would pay all expenses in connection with the property and its upkeep. The lease which covered twice the period of time necessary to pay off the note was just as binding a document as the deed transferring the property. In our view the substance of the transaction was merely a rental payment by HME to the lessors of $1,500 less $138.88 per month for the first 15 years and $1,500 thereafter and not in substance a payment of either $65,000 to HME for the Knoxville terminal or a payment of $40,000 plus whatever under ordinary circumstances might be determined to be the fair market value of a $25,000 promissory note without interest payable in 180 monthly installments. It might be noted that if a promissory note were in fact signed, it is not in evidence in this case. For reasons that have not been explained in the record, the parties wished to show in some way on the books of HME a $65,000 payment for the Knoxville *363 terminal and also a monthly payment to Johnnie and the 257 trusts for petitioner's and Johnnie's minor children of $138.88 less for the first 15 years than thereafter and took the means of a so-called "promissory note" to accomplish this purpose. If we were to recognize the full transaction at arm's length, we would agree with respondent that because there was a valid 30-year lease of the property to HME, we should give great weight to the amount of income which the property was to produce over the next 30 years in determining its fair market value. Had we determined the fair market value of the Knoxville terminal by capitalizing the $1,500 monthly rental, and deducted from such amount as the cost of the property, the $40,000 cash plus the fair market value at the date of the sale of the $25,000 noninterest-bearing note, a greater gain would result to petitioner than we have here determined. However, our view of the transaction is that it was not an arm's-length transaction at all, but a method used by petitioner to assure his former wife and the trusts for his minor children a monthly payment from HME under a binding contract. Since the Knoxville terminal was specifically built *364 for the operation being conducted by HME, it was logical to assume that any carrier which might purchase or take over HME's operations would need the use of the Knoxville terminal and assume the lease. In any event the lessors' rights under the lease against HME would be present. The stockholders of HME sold their stock to Ryder but the corporation was continuing to make the rental payments under the lease for the Knoxville terminal. Viewing the transaction as we do, we have concluded that the amount of payment made to HME, to be subtracted from the $97,489.65 fair market value of the Knoxville terminal we have determined to arrive at the income to petitioner from the transaction, is $40,000 and that the amount of $57,489.65 is includable in petitioner's 1958 income as a result of this transaction. We do not understand petitioner to now contend that any amount he received from HME for which HME was not compensated was not income to him. It is now well settled that all receipts by an individual of money or property not specifically excluded by statute from his gross income constitute income to the individual. Where amounts are received by a stockholder from a corporation, questions *365 have arisen as to whether the receipts should be considered as distributions of dividends and therefore ordinary income to the recipient only to the extent of the corporation's earnings and profits available for distribution as dividends to its stockholders, or as income irrespective of corporate earnings and profits. Compare such cases as Davis v. United States, 226 F. 2d 331 (C.A. 6, 1966), and Elmer J. Benes, 42 T.C. 358, 378 (1964), affd. 355 F. 2d 929, 956 (C.A. 6, 1966), holding that amounts diverted by a stockholder from his corporation constitute income to him irrespective of the corporate earnings and profits with cases such as Louis Greenspon, 23 T.C. 138, 151-152 (1954), affirmed on this issue 229 F. 2d 947 (C.A. 8, 1956), holding distributions to a stockholder, even absent the formal declaration of a dividend and even though not in proportion to stockholding, to constitute dividends which are ordinary income to the recipient only to the extent of the corporate earnings and profits. In the instant case, it is immaterial which view is taken of the income which petitioner received from HME under the various circumstances here present. As we have set forth in our findings, *366 HME's accumulated earnings and profits as of the beginning of each of the years here in issue far exceeded the total amount of additional income to petitioner from HME as determined or now claimed by respondent. We have set forth in some detail the circumstances under which Fred Capshew was employed by HME and the nature of Fred Capshew's work. From the facts which we have found, we have concluded that by far the greater portion of the work done by Fred Capshew was in connection with either HME's business or activities in which petitioner was engaged for the production or collection of income. Had petitioner paid Capshew's salary and expenses for this latter type of activity he would have been entitled to deduct the expenditure. However, the evidence does show that Capshew paid certain personal bills of petitioner and was reimbursed for the amounts he so expended by vouchers filed with and paid by HME, and that Capshew did some personal services for petitioner such as writing his personal checks, keeping his personal checkbook in balance, and paying his personal bills. Weighing all the evidence, we have concluded that petitioner received income because of salary and expense money paid *367 by HME to Fred Capshew in the amounts of $600 in 1958 and $3,000 in 1959. This issue is purely factual and the figures we have determined are our best judgment 258 based upon all the facts of record in regard to Fred Capshew's employment by HME, his work for HME, his work on behalf of petitioner, his expenditures for petitioner's personal bills, and the value of the personal benefits petitioner received from these payments by HME less the amount petitioner would be entitled to deduct if his income were increased because of the services rendered to him by Capshew in connection with his various income-producing activities. The next issue is the extent if any that petitioner's income for 1957, 1958, and 1959 should be increased by the payments petitioner received from HME with respect to his "expense accounts." The record shows that for the years 1957, 1958, and 1959 charges for expenses incurred by petitioner were made directly to HME. The record shows that petitioner had use of HME's airplane and two automobiles which HME kept for his use. Particularly for the years 1958 and 1959, the evidence shows that for many days, and for some periods of a week or more, what appears to constitute *368 all of petitioner's expenses, not only for food and lodging but also for any entertainment he might have done, were charged directly to and paid directly by HME or were paid by Turner who was reimbursed for the payments directly by HME. In fact, the evidence shows a number of occasions where travel by petitioner which appears to have been for his business interests other than HME, particularly for John L. Burns, Inc., and McMinnville, were paid for directly by HME. There is also some indication that travel expenses of petitioner in connection with his own oil interests or his interests in Colorado-Southern were in some cases paid by HME. In the light of this evidence respondent contends that the full amount which HME paid to petitioner on the basis of "expense accounts" filed by petitioner should be included in petitioner's taxable income. Since the evidence clearly shows that petitioner kept no record of his expenses, there is some support in various cases for respondent's position. All of the actual figures entered in the various columns in petitioner's expense accounts were completely fictitious and were put in by either Hembree or Turner for the purpose of arriving at the amount *369 which petitioner had stated should be the total of the expense account for that week. However, from the nature of petitioner's work and from the evidence as a whole in this case, we have concluded that petitioner did have some legitimate business expenses for HME in addition to the amounts paid directly by HME in each of the years 1957, 1958, and 1959. The evidence shows that much of HME's day-to-day business was conducted by other persons and that these other individuals had rather substantial expense accounts. Petitioner argues from this that it would follow that he likewise would have comparable expenses for HME. We do not agree with this contention. Petitioner must show that he incurred expenses for HME. The fact that other officers incurred substantial expenses for HME in no way proves that petitioner also incurred such expenses. The evidence shows that petitioner devoted much of his time during the years here in issue to his other business interests and to his race car hobby. Nevertheless, there were some references to occasions when petitioner was actually engaged in conducting business of HME when he would have necessarily incurred expenses for HME which probably he would have *370 been required to pay in cash. We have, therefore, concluded that petitioner is required to include in his income the amounts he received from HME as payments on his "expense account" for the years 1957, 1958, and 1959, respectively, and that he is entitled to deduct in each of these years the sum of $2,500 as ordinary and necessary business expenses. In arriving at this amount we have given consideration to petitioner's activities as compared to those of the other company officers of HME. We have considered the amount of the expense allowances of such officers as HME's general manager and sales manager in relation to the duties they performed as compared to the duties performed by petitioner. We are not persuaded that the amount of the expense allowance of HME's sales manager in any way indicates what petitioner's expenses would likely be. The very nature of the duties of the sales manager would suggest that most of the entertaining of customers and prospective customers would be done by him. Also, there is no indication in the record of whether the sales manager's "expense allowances" included any amounts he charged directly to HME. Furthermore, there is no showing in the record that *371 another employee of HME paid many of the sales manager's expenses and received reimbursement from HME in the manner that Turner received reimbursement for expenses paid for petitioner. If 259 any inference at all were justified from the evidence of the expense allowances of other officers of HME, it would be that petitioner's expenses not paid directly by HME would in no way be comparable to the expenses of HME's sales manager and since no other officer received an expense allowance approaching the amount petitioner claims he spent for the benefit of HME, that petitioner's claimed expenses are grossly overstated. The determination of this issue is based on our best judgment of an estimate of petitioner's expenses which we have made in a situation where there are no available exact figures. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). A difficult factual problem in this case centers on the amount of income petitioner received because of the various payments made by HME on invoices which bore the designation "S-shop." Petitioner takes the position that he has shown so many errors in respondent's determination that we should conclude that no amount of income from payments with *372 respect to the "S-shop" invoices is includable in petitioner's income. Petitioner cites Helvering v. Taylor, 293 U.S. 507 (1935); Gasper v. Commissioner, 225 F. 2d 284 (C.A. 6, 1955); A. & A. Tool Supply Co. v. Commissioner, 182 F. 2d 300 (C.A. 10, 1950); and Durkee v. Commissioner, 162 F. 2d 184 (C.A. 6, 1947), holding that where a taxpayer has produced sufficient evidence to show that the Commissioner's determination was without rational foundation and excessive, it is not incumbent upon that taxpayer to show that he owes nothing or if anything, the correct amount he owes. Even if we accept petitioner's evaluation of the number of errors he has shown that respondent made with respect to the "S-shop" invoices and petitioner's interpretation of the law, the problem here is not solved. Petitioner has shown that some of the "S-shop" invoices relating to farm items were payments which would have constituted deductions by petitioner as farm expenses had he paid the amounts himself. Respondent has agreed that the amounts of the so-called "farm items" are not includable in petitioner's income. Petitioner has also shown one specific item, the so-called "fifth wheel," for which McMinnville *373 paid HME, and respondent now concedes this item also. In addition petitioner has shown that even though there were no accounts receivable carried on the books of HME for McMinnville, Kentucky Aggregates, John L. Burns, Inc., and Burns Equipment Company, these various companies did make some payments to HME for equipment purchases or maintenance. The general managers of McMinnville and John L. Burns, Inc., each testified that he thought HME made relatively few purchases for his company and that on the few occasions when HME did make such purchases or render services, he thought it was the intention that his company reimburse HME. We consider the evidence to show that some of the items purchased for McMinnville and John L. Burns, Inc., or their related companies, were actually paid for by the recipients of the items. We also consider that a fair inference from the evidence is that some of the items included in respondent's "S-shop" schedules were items that were used in connection with repairs of the Nashville terminal or facilities connected with that terminal or for automobiles owned by HME. However, the evidence is completely clear that some of the items covered by the "S-shop" invoices *374 were items for petitioner's personal use or the personal use of petitioner's family. There are various other items of mechanical equipment included on the schedule of the "S-shop" items which cannot be precisely placed as being for the use of HME or for petitioner's personal use or an unreimbured item for the use of one of petitioner's other business interests. Neither party attempted to analyze in detail by addition of all of the various invoices the items which fall into the several categories. We have studied the lists of invoices and from such study concluded that there were numerous items which were designated in such a manner that we are unable to judge the actual usage of the items. From our study and consideration, we conclude that a little over one-half of the so-called "S-shop" items remaining in issue for the years 1957 and 1958 were items for petitioner's personal use or the use of his family or unreimbursed items purchased for other business interests of petitioner. For the year 1959 we have concluded that approximately one-half of the so-called "S-shop" items remaining in issue are items which were for the personal use of petitioner or his family, or were items for petitioner's *375 other business interests for which HME was not reimbursed. In arriving at this conclusion we have been influenced by the 260 fact that had petitioner's other business interests made reimbursements in very substantial amounts to HME, the managers of those companies would have known of the fact and the companies' books and records would have revealed the payment. We are also influenced by the evidence of the various directions of petitioner to HME's employees to conceal the "S-shop" payments. The evidence shows that there were accounting categories in the ICC system in which any legitimate payment for parts or services by HME could be placed. The so-called "explanation" for the "S-shop" designation is totally unpersuasive. We are convinced from the evidence that "S-shop" was intended to cover up irregularities occasioned by payments made by HME for items for petitioner's use on his farm, the family farm, and for items for various other personal uses of petitioner. In the actual process of designating "S-shop" invoices, it is apparent that some items were marked "S-shop" which should not have been so marked. In the process of having HME pay for some of his personal expenses, petitioner *376 started a system that left so much room for error that many errors were made. We have considered the evidence in detail in reaching our conclusion. From all the evidence of record, we have found as an ultimate fact that petitioner received taxable income from payment by HME of his personal expenses or expenses of his other business interests of amounts billed on invoices included in the so-called "S-shop" items in the amounts of $3,000, $5,000, and $10,000 for the years 1957, 1958, and 1959, respectively. The amounts of cash which petitioner received from checks which were charged on HME's books to liquor purchases and from Hembree's excessive charges on his expense accounts submitted to HME is not in dispute. The dispute between the parties with respect to these amounts is whether these amounts were income to petitioner to any extent. Respondent argues that petitioner has not established how much of this cash was used to make political contributions in the years here in issue or whether such contributions as were made were for the benefit of HME or for other business interests of petitioner. We have concluded that the evidence does establish that political contributions were made *377 for the benefit or in the name of HME in each of the years here in issue, and from the evidence have concluded that the amounts so contributed were $6,000 in 1957, $7,500 in 1958, and $13,000 in 1959. The more difficult problem is in determining whether petitioner realized income from the total receipts of cash or only from the portion which he did not disburse as political contributions on behalf of HME. Petitioner argues without citation of any authority, that since petitioner received the cash, put it in a safe on HME's premises, and disbursed it or had it disbursed to candidates whom he felt would support the interest of HME, the sum was never beneficially received by petitioner but was merely money passed on through petitioner for the benefit of HME. Respondent on the other hand argues that since the cash was handed over to petitioner and was under his control wherever it was physically located until it was disbursed, it was subject to petitioner's free control and claim of right and was income to petitioner even to the extent that he did pass it on as political contributions on behalf of HME. Obviously, political contributions were not deductible by either petitioner or HME. *378 Therefore, if the money was received by petitioner as his own, it is income to him. The question is did he receive it as his own or merely as agent or representative of HME to spend for HME's benefit. We have had cases involving somewhat related questions. In Manson L. Reichert, 9 T.C. 1027, 1037-1038 (1953) affd. 214 F. 2d 19 (C.A. 7, 1954), we held that certain payments which the taxpayer there received as contributions from tavern keepers and bookies which the taxpayer used as "pay-off" to various individuals or turned over to another to be used in connection with political activities were not includable in that taxpayer's income. We stated that the amounts were received by the taxpayer to be used for political campaign purposes and were turned over to another individual for such use. We distinguished these amounts turned over to another individual for use in political campaigns from other amounts which the taxpayer contended were political contributions which we concluded the taxpayer retained. In William O'Dwyer, 28 T.C. 698 (1957), affd. 266 F. 2d 575 (C.A. 4, 1959), we held 261 that an amount given to the taxpayer there involved, intended as a political campaign contribution, *379 had not been shown to have been used for that purpose and was therefore includable in the taxpayer's income. In so holding, we stated at page 702: * * * If it were such [a political or campaign contribution] and were in fact used for such purposes then it would not constitute taxable income. On the other hand, if petitioner retained the money or diverted it to his own personal use, it would be taxable income to him. The distinction has been plainly set forth in Manson L. Reichert, 19 T.C. 1027, affirmed 214 F. 2d 19 (C.A. 7), certiorari denied 348 U.S. 909. See also Rev.Rul. 54-80, 1954-1 C.B. 11. These cases are not on all-fours with the instant case. However, in our view the rationale of those cases supports the conclusion which we have here reached that to the extent petitioner passed on the cash received under his arrangement with Hembree as political contributions on behalf of HME, the amounts are not includable in petitioner's income. Petitioner did not receive these funds for his own use but to be used by him for HME. Therefore he never had the funds as his own to the extent they were used for the benefit of HME. To the extent that these funds were not used for the purpose *380 for which petitioner received them, they are includable in petitioner's income even though they might have been paid for political contributions on behalf of other business interests of petitioner or used for some other personal purpose of petitioner. Any such use of the funds was a conversion of the funds to a use for petitioner's benefit and therefore income to him. Only to the extent that in effect the money merely passed through petitioner's hands as contributions on HME's behalf is the amount not income to petitioner. We have therefore concluded that petitioner received income from his arrangement with Hembree with respect to cash to be received from Hembree's excessive expense accounts and checks charged to liquor purchases in the amounts of $1,546.39, $5,747.84, and $1,263.83 in the years 1957, 1958, and 1959, respectively. The final issue is whether respondent has shown by clear and convincing evidence that a part of the underpayment in petitioner's tax for each of the taxable years 1957, 1958, and 1959 was due to fraud so that the addition to tax provided for under section 6653(b) is applicable. For the year 1957 petitioner has conceded that amounts totaling $17,116.61 which *381 were paid under the circumstances described in our findings of fact to Tidewater constituted taxable income to him. We have found that the $4,000 paid in this year by HME to the Midwest Sprint Car account constituted taxable income to petitioner and that $8,607.44 of the amount petitioner received with respect to his expense accounts, $3,000 of the amounts paid on "S-shop" invoices and $1,546.39 of the amounts received for use as political contributions contituted taxable income to petitioner. Respondent contends that all of these items were fraudulently omitted from income by petitioner. There are, in addition, certain other adjustments agreed to between the parties, but respondent does not contend that the omission of any such items in the year 1957 constituted fraud. In the year 1958, respondent contends that different amounts for the items comparable to those omitted in 1957, which petitioner has agreed should be includable in his income, or we have found are properly includable in petitioner's income, and the $926.32 of payments by HME for groceries for petitioner, the $767.47 paid by HME for petitioner for a hospital bill of petitioner's mother-in-law, and $283.91 of payments *382 by HME to the Robert McIntyre Nursery for petitioner, which items petitioner agrees are properly includable in his income, were fraudulently omitted from income by petitioner. For the year 1958 respondent also contends that omission of any gains from the sale of the Knoxville terminal to Johnnie and any amount for the salary or expense account of Fred Capshew constituted fraud. For the year 1959 there is no inclusion in petitioner's income for payments made to Tidewater, but with this exception respondent contends that items, though in differing amounts, comparable to those in 1958 many of which petitioner agrees are includable in his income, were fraudulent omissions from petitioner's income. In addition, respondent contends that the omission by petitioner of the $10,421.86 of payments by HME for improvements to his personal residence and the $5,000 credited by HME on fictitious invoices of Auto for batteries and pressure plates were omitted by petitioner from his income with the fraudulent intent to evade tax. Petitioner has conceded that the $5,000 item representing the fictitious invoices of Auto for batteries and pressure plates and the $10,421.86 representing payments by HME *383 262 for improvements to his personal residence are properly includable in his income. Petitioner contends that none of the omissions from his income, including those which he now concedes to be properly includable in his income, was due to fraud with intent to evade tax. Petitioner makes some argument that the amounts he reported as "miscellaneous income" were intended to cover any items he might need to report which he failed to include in income. The amounts reported by petitioner on his income tax returns as "miscellaneous income" are so small that we do not believe petitioner ever intended that they cover the large amounts of his omitted income. We believe they were intended, as the returns stated, to cover such incidental items as "trades" petitioner might have overlooked otherwise. Petitioner states that the controlling factor on the issue of fraud is not whether a particular item was improperly omitted from his income, but is whether he knew or had reason to believe that the omitted item constituted income to him and with that knowledge fraudulently omitted the item from his income as reported. Petitioner states that each omission of an item from his income as reported on *384 his tax returns for the years 1957, 1958, and 1959 was made in the belief that he was not required to include the item in income. He justifies his position by stating that he thought that either he or someone had paid tax with respect to the various items which represented payments to or for his other corporations and that it was his understanding that anything he might receive that was not his was not taxable. [7] *385 If a taxpayer honestly believed that he was not required to report an item as income, his failure to include such item in the income reported on his tax return would not be fraud with intent to evade tax. In determining whether the omission was an honest mistake or was fraudulent, all the evidence must be considered and not merely the taxpayer's testimony in explanation of the omission. Elmer J. Benes, 42 T.C. 358, 379 (1964), affirmed 355 F. 2d 929 (C.A. 6, 1966). Where the omitted income was fraudulently or illegally received, this fact may be considered along with all the other evidence. In most cases in which respondent has determined an addition to tax for fraud, the taxpayer offers some explanation of the omissions which he contends shows that he had no fraudulent intent to evade tax. Therefore, it is generally necessary to determine whether the omission was made with fraudulent intent by considering the taxpayer's explanation in the light of all the evidence, as well as the intelligence, education, and business knowledge of the taxpayer. Petitioner, in the instant case, was an intelligent, well educated, astute *386 businessman. He knew that Tidewater was carrying on no business activities in the year 1957 and that the money he was placing in Tidewater was being placed there in order that Tidewater might make payments to M. L. Parris, whom petitioner married upon his divorce in 1958, and to accumulate money to invest for petitioner's benefit. The evidence shows that the only disbursements made by Tidewater during the years 1957 and 1958 were to M. L. Parris, Colorado-Southern, and the Internal Revenue Service. Colorado-Southern was a corporation in which petitioner had an interest and which was engaged in owning and developing oil properties. Therefore, the only activities of Tidewater, besides the receipt of funds which petitioner had paid to it through the means we have set forth in our findings, were to issue checks to M. L. Parris and invest in oil properties. Petitioner owned all of the stock of Tidewater. Petitioner had Hembree prepare an income tax return for Tidewater, signed in the name of "M. L. Parris," well knowing not only that the tax rates on the income reported thereon would be lower than the rate on the same income were it reported by him had he received the income directly and *387 263 invested it in Tidewater, but also that Tidewater's income was to be reduced by the $8,869 paid by Tidewater to M. L. Parris. The return filed in the name of M. L. Parris reported no income other than the $8,869 from Tidewater and claimed a standard deduction. Petitioner was certainly sufficiently astute to know that the tax rates on $8,869 reported in the name of M. L. Parris were lower than the rates would be on the same income included on his tax return, and he also knew that by deducting this amount from Tidewater's income, the only tax paid on the amount was that paid in the name of M. L. Parris. The Tidewater returns were filed by Hembree at petitioner's direction. Hembree wrote on the returns the name, "M. L. Parris" also specifically at petitioner's direction. The evidence is clear and unambiguous that petitioner knew that all of the payments which he arranged to have made to Tidewater were for his own personal benefit. The record is clear that M. L. Parris rendered no services to Tidewater and that the amounts paid to her, if in fact the payments were made to her, were in effect moneys transferred to her by petitioner. It is inconceivable that petitioner could have *388 believed that had he directly given $8,869 to M. L. Parris in 1957 without any service being rendered for the payment, the amount would have been deductible from his income. We observed petitioner carefully as a witness and are convinced from his general demeanor and the business acumen which he displayed and from his knowledge of business transactions, as disclosed by his numerous financial interests, that he knew the moneys transferred to Tidewater were amounts in substance received by him. We do not understand exactly the items to which petitioner was referring when he said that he thought anything he might receive which "was not his" was not includable in his taxable income. Certainly, he could not have had any belief that the amounts paid directly to Tidwewter by Bransford, Sharpe & Company were amounts he received which were "not his." These payments alone totaled $4,000 in 1957. For the year 1957 we are convinced that the omission by petitioner from his income tax return of the amounts which he had paid over to Tidewater was fraudulent with intent to evade tax and that therefore some of the underpayment in tax for 1957 was due to fraud with intent to evade tax by this omission *389 alone. There are other items omitted from petitioner's income reported on his return for 1957 which the evidence shows petitioner must have known were income to him. For the year 1957, some amounts shown on petitioner's expense accounts for which he was reimbursed by HME are for days when the evidence shows that direct payments had been made by HME for the same claimed expense. Nevertheless, no portion of the amount received by petitioner as payment of his expense accounts was included in petitioner's income reported on his tax return. In this year also there was a payment of $4,000 to the Midwest Sprint Car account. Toward the end of 1957 petitioner and Wills were arranging to buy the race car which was to be entered in the Indianapolis 500 Race. Whatever petitioner may have considered with respect to some other payments by HME of race car expenses, certainly, when the race car was to be owned by petitioner and Wills, petitioner knew that any payment on the purchase price of the race car was income to him. The inference from the record is that the $4,000 payment in 1957 was used as part of the purchase price of the race car. For 1958 we have the same situation as in 1957 except that *390 the amounts of payments to Tidewater are less and payments to the Midwest Sprint Car account including those by way of fictitious invoices are more. Also, direct payments for petitioner's benefit by HME for groceries, hospital bills, and shrubbery were made in 1958. In 1959, as heretofore pointed out, a payment of $10,421.86 was made by HME for improvements to petitioner's residence, as well as payments for hospital bills and shrubbery and the $5,000 amount which petitioner concedes to be income representing a part of petitioner's investment in Auto. Also, for the years 1958 and 1959, the record is clear that the amounts paid by HME to Auto on fictitious invoices in the 15,000 series were not included in Auto's taxable income and therefore no tax on these items was paid by any entity. The evidence is clear and convincing that petitioner knew for the years 1958 and 1959 that he received benefits from payments made by HME on which no entity paid tax. Petitioner in his argument contends that he intended that any amounts paid for his benefit by HME be charged against his personal account and that there was no fraud in his failure to include such items in his income. However, the record *391 shows that 264 Hembree regularly showed petitioner his personal account and except for transfers from other accounts the only item charged against that account in any of the years here in issue was a grocery item entered on December 31, 1959, after HME's auditors had discovered the item charged to HME. We therefore are convinced that petitioner did know that none of the items paid by HME for him was charged against his personal account on HME's books and he did know that HME was paying these personal items. Therefore, the only contention of petitioner we need to further consider with respect to these items is whether he did in fact believe that they were amounts which he received which were "not his" and for that reason not includable in his income. Petitioner in his brief argues that "the taxpayer was of the belief that sums which he might receive improperly and which did not belong to him were not required to be included in his tax return. Petitioner's testimony with reference to the article in the Wall Street Journal obviously must have referred to the case of Commissioner v. Wilcox, 327 U.S. 404." Petitioner then refers to the various cases distinguishing Wilcox and deciding *392 whether a particular form of larceny was or was not embezzlement within the meaning of that decision but does not argue that petitioner's receipts here were embezzled funds. Petitioner rather contends that no useful purpose would be served in analyzing those cases since "the only issue is whether or not the taxpayer believed that this sum should have been included in his personal tax return." Petitioner argues that a layman cannot be expected to distinguish between embezzlement and other forms of larceny, citing Adame's Estate v. Commissioner, 320 F. 2d 811 (C.A. 5, 1963), reversing in part 37 T.C. 807 (1962). In Adame's Estate v. Commissioner, supra, the Court of Appeals referred to the decision in Rutkin v. United States, 343 U.S. 130 (1952), limiting the Wilcox case to its facts and James v. United States, 366 U.S. 213 (1961) overruling Wilcox, but holding that a taxpayer could not be convicted of fraud for failure to report embezzled funds "so long as the statute contained the gloss placed upon it by Willcox * * *." The Fifth Circuit in Adame's Estate concluded that likewise a taxpayer was not subject to the addition to tax for fraud for failure to declare moneys which "the law *393 as it was understood at the time did not require him to report * * *." Between the time of the decision in the Rutkin case in 1952 and the decision in the James case in 1961, cases arose dealing with whether an amount was embezzled or obtained by some other illegal means. Amounts which were held not to be embezzled funds were held to be includable in the taxpayer's income and in some instances a taxpayer was either criminally convicted of fraud or held subject to the addition to tax for fraud for failure to report the item on his income tax return. Berra v. United States, 221 F. 2d 590 (C.A. 8, 1955), affirmed on another issue 351 U.S. 131 (1956), and Kann v. Commissioner, 210 F. 2d 247 (C.A. 3, 1953), affirming 18 T.C. 1032. Since the Supreme Court's decision in the James case, courts have likewise held that where the item was obtained by some illegal means other than embezzlement or an act so near embezzlement that a layman could not be expected to distinguish the act from an act of embezzlement, the omission of such an item from a taxpayer's income may be a fraudulent omission. United States v. Jannsen, 339 F. 2d 916 (C.A. 7, 1964). The facts in the instant case are not comparable *394 to those in Adame's Estate v. Commissioner, supra, which involved a superintendent of schools who received blank checks from the trustees of the school district for use in payment of school expenses. That taxpayer, when paying a bill for school supplies, would write a check for more than the amount of the bill and retain the cash. The fact that a taxpayer under such circumstances might have believed that the amount represented funds in the nature of embezzled funds which he was not required to report for income tax purposes is not helpful in the instant case. The funds in this case were received by many devious means by the president of a corporation who was in control of that corporation. These facts are more comparable to those in United States v. Jannsen, supra, where the president of a corporation made an arrangement with the supplier of that corporation whereby invoices would be falsified so that a portion of the payment which should have gone to the company of which the taxpayer was president, went instead to the taxpayer. 265 Another case involving facts more comparable to the instant case than those involved in the Adame's case is United States v. McGuire, 347 F. 2d 99 (C.A. *395 6, 1965). The taxpayer in that case had various unlawful schemes for obtaining funds from his employer none of which was embezzlement or so close to embezzlement that a layman might be confused as to the nature of the unlawfully obtained gains. In concluding that the taxpayer's conviction for criminal fraud should be upheld the Court, in United States v. McGuire, supra, stated that Adame's Estate v. Commissioner, supra, was inapposite. The various means used by petitioner in the instant case to obtain funds were not embezzlement and petitioner does not contend that they were. Petitioner contends only that petitioner "believed" the amounts were not includable in his income. From all the facts here of record including petitioner's testimony, and from our observation of petitioner as a witness, we have concluded that petitioner was aware that amounts of his personal expenses paid by HME, as well as the funds he obtained by having payments made to Tidewater, constituted income to him and that he deliberately and knowingly omitted the amounts from his income as reported. We conclude that petitioner's statement with respect to being a "shade tree lawyer" and not believing amounts which he *396 received which were "not his" to be income to him was an afterthought which came to him after discovery by respondent of his many omissions of income from his tax returns. See Cohen v. United States, 297 F. 2d 760, 769 (C.A. 9, 1962). Much of what petitioner was obtaining from HME was in effect obtained with the consent of the other stockholders. Ruth N. Garrett testified that she was unaware of many of petitioner's activities until the time the Ryder suit was filed and the parties stipulated that if the other stockholders were called as witnesses, they would testify to the same effect. However, these stockholders knew they were being paid salaries by HME for no work done by them and in fact for years in which they were not even directors of the company. They also knew of the salary paid to the husband of Eleanore E. Derryberry, who managed the family farm and rendered little, if any, services to HME. Ruth Garrett knew, and the inference is so did the other stockholders, of the expense allowance paid to her by HME to use as she pleased, and all of the stockholders were aware of the income they received from Truck Equipment and Supply Company whose primary customer was HME and the *397 Miriam Hoover Rental Agency whose income was primarily from terminals rented to HME, and they knew to a large extent that petitioner had arranged these sources of income for them. These stockholders also knew of incidental benefits they received from HME such as airplane tickets paid for by HME and trips in the airplane owned by HME. The clear inference from this entire record is that the other stockholders knew of certain diversions of HME's income for their benefit, knew that petitioner was running HME as he saw fit, and were aware that he also received some personal benefits at the expense of HME. The fact that the other stockholders were not aware of all of petitioner's diversion of funds of HME for his personal benefit in no way indicates that petitioner might have reasonably thought he was embezzling any funds. Petitioner's concealment of the funds he took from HME was in our opinion in order to permit HME to obtain an income tax deduction for expenses for sums which he would not report on his personal tax return. The record is clear that petitioner was in reasonably close contact with his family and knew that they were generally aware of the manner in which he was operating *398 HME, even though they did not know of certain specific diversions for his own benefit that he was making of HME's income. Although petitioner owned only 21 percent of HME's stock, he was in control of the corporation and in general the other stockholders in the corporation acquiesced in his handling of the corporate affairs. Petitioner could have obtained funds from HME by legitimate means such as having more dividends declared or a bonus paid to him and in keeping with their reliance of petitioner's handling of HME's affairs the other stockholders would have approved. However, such legitimate receipts would be difficult to conceal from the accountant who prepared petitioner's tax returns. We conclude that petitioner's failure to report on his Federal income tax returns for 1957, 1958, and 1959 the amounts he received from the various diversions of funds of HME for his personal use was with a deliberate and fraudulent intention to evade income tax on those funds. Diversion of corporate funds under circumstances comparable to those here present 266 have been recognized to be such that a taxpayer should know the amounts were includable in his income, so that the omission of such amounts *399 from his income constituted fraud with intent to evade tax. W. L. Kann, 18 T.C. 1032, 1044 (1952), affirmed 210 F. 2d 247 (C.A. 3, 1953). See also Estate of Helene Simmons, 26 T.C. 409, 422 (1956), and Elmer J. Benes, 42 T.C. 358, 384-385 (1964), affirmed 355 F. 2d 929 (C.A. 6, 1966). We therefore hold that a part of the underpayment in petitioner's income tax for each of the years 1957, 1958, and 1959 was due to fraud with intent to evade tax and sustain respondent's determination of addition to tax under section 6653(b) for these years. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Eph H. Hoover, Jr., and Johnnie B. Shannon (Former wife of Eph H. Hoover, Jr.), Docket No. 2313-62; Eph H. Hoover, Jr., and Lucinda Hoover, Docket No. 2322-63; and Eph H. Hoover, Jr., and Johnnie B. Shannon (Former wife of Eph H. Hoover, Jr.), Docket No. 6192-66.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
3. The respondent's stamp on this return appears to be April 19, 1957. However, neither party contends that the return was not timely filed but have asserted that it was timely filed. Petitioners signed the return under date of April 12, 1957.↩
4. This stock ownership is in accordance with the stipulation of facts filed by the parties. The reports of HME filed with the ICC show the following stockholders of HME in 1956 and 1957: ↩
E. H. Hoover, Jr
21
Dorothy H. Milam
19
Eliz. H. Derryberry
19
O. M. Hoover
5
Miriam H. Cole
19
Ruth H. Garrett
19
Maralee Pond
2
5. The small difference in the total grocery item as shown by the invoices and the amount charged to petitioner's account is not explained in the record.
6. Johnnie testified as follows: Q. Mrs.Hoover, who arranged the property settlement with Mr. Hoover on your behalf? A. Mr. Harry Mittwede. Q. What were the specific terms of that settlement? MR. HARWOOD: We object to the specific terms in all of its aspects because I don't think it is any concern here. If you want to ask her if there was any other property settlement other than this, I think she will answer that. BY MR. BROOKS: Q. What was the property settlement that you testified was reached between you and Mr. Hoover in November 1957? MR. HARWOOD: Mrs. Hoover, if you want - (Interrupted.) MR. BROOKS: Please don't interrupt. MR. HARWOOD: I am not trying to instruct the witness. I am trying to tell the witness that she has no obligation to give the number of dollars. MR. BROOKS: You just be quiet, Mr. Harwood. MR. HARWOOD: I won't be quiet. I don't think this concerns this matter that you are questioning her about. This was a personal property settlement. This building was not in the property settlement. THE WITNESS: I bought the building with the money that I received from Mr. Hoover. That was not all of the property settlement. BY MR. BROOKS: Q. Do you refuse to state what the property settlement was? A. Yes, I do. Q. Mrs. Hoover, did Mr. Mittwede represent you at the hearing on your divorce before Judge Trimble? A. Yes, he did. Q. Did you say that you heard the conversation between Mr. Mittwede and Judge Trimble with respect to the property settlement and care of the children? A. I heard it all, of course. I was sitting in the courtroom, but to tell you just every detail as to what was said between Judge Trimble and Mr. Mittwede at that time, I cannot recall. As most people would be, I was upset at that particular moment and I can't recall.
7. Petitioner's exact testimony is as follows: Q.I. will ask you again, did you have any reason to believe, or did you believe that any item that might ultimately be charged to you in this procedure, which may not have appeared on your tax return was required to be filed and included in your tax return? A.I thought, and it is still my belief now that I either paid tax or the company paid tax and anyway that it was handled that the taxes were paid on any part of the income, no matter where it came from or where it went or that anything other than that I would not need to pay tax on it. Q. Why did you think that? A. I have been in business for a long time and I guess I am a shade tree lawyer and I read the Wall Street Journal and different things and it was my understanding that anything that I might receive that was not mine was not taxable.